## No. 26790

**In Re Interrogatories Propounded by the Senate concerning House Bill 1078.**

(536 P.2d 308)

Decided May 29, 1975.                    Rehearing denied June 23, 1975.

. . .

David J. Hahn, Douglas G. Brown, Michael T. Risner, for proponents of Amendment No. 6.

John R. Bermingham, Moran, Reidy & Voorhees, for proponents of Amendment No. 9.

J. D. MacFarlane, Attorney General, Jean E. Dubofsky, Deputy, Edward G. Donovan, Solicitor General, Mary J. Mullarkey, First Assistant.

*En Banc.*

MR. CHIEF JUSTICE PRINGLE and MR. JUSTICE GROVES delivered the opinion of the Court.

At the general election in Colorado, held on November 5, 1974, among other propositions on the ballot were No. 6 and No. 9, being proposed constitutional amendments relating to reapportionment. Amendment No. 6 was addressed to several other subjects, while Amendment No. 9 was solely concerned with reapportionment. Amendment No. 6, referred by the General Assembly, received 386,284 affirmative votes; and there were 386,725 votes for Amendment No. 9, which had been initiated by petition. Thus, No. 9 received 441 more votes than did No. 6.

House Bill 1078, which if adopted would amend the boundary lines of certain state representative districts, is now pending in the First Regular Session of the Fiftieth General Assembly of Colorado. It has passed in the House of Representatives. After being passed upon second reading in the Senate, that body adopted Senate Resolution No. 17, being interrogatories which are contained in the appendix to this opinion.[1] Our affirmative or negative answers follow each interrogatory in the appendix.

On and prior to November 5, 1974, *Colo. Const.* Art. V, §46, 47 and 48 read as follows:

"Section 46. Senatorial and representative districts. The state shall be divided into as many senatorial and representative districts as there are members of the senate and house of representatives respectively, each district in each house having a population as nearly equal as may be, as required by the constitution of the United States.

"Section 47. Composition of districts. Each district shall be as compact in area as possible and shall consist of contiguous whole general election precincts. Districts of the same house shall not overlap. Except when declared by the general assembly to be necessary to meet the equal population requirements of section 46, no part of one county shall be

---

[1]The interrogatories were submitted under the provisions of *Colo. Const.* Art. VI, §3.

added to all or part of another county in forming districts. When county boundaries are changed, adjustments, if any, in legislative districts, shall be as prescribed by law.

"Section 48. Revision and alteration of districts. (1) In the regular session of the general assembly in 1967, and at each such session next following official publication of each federal enumeration of the population of the state, the general assembly shall establish or revise and alter the boundaries of senatorial and representative districts according to the provisions of sections 46 and 47. After forty-five days from the beginning of each such regular session, no member of the general assembly shall be entitled to or earn any compensation for his services or receive any payment for salary or expenses, nor shall any member be eligible to succeed himself in office, unless and until such revision and alteration shall have been made.

"(2) Each paragraph, sentence and clause of sections 45, 46, 47 and 48 shall be deemed to be severable from all other parts thereof and shall be interpreted to preserve, as the primary purpose thereof, the creation of single member districts. Nothing in said sections contained, nor any judgment or judicial declaration pertaining to sections hereby repealed, nor the failure of the State of Colorado to conduct a census in 1885 and subsequent years, shall affect the validity of laws at any time enacted by the general assembly or by the people on any subject not directly pertaining to legislative districting or apportionment."

Portions of Amendment No. 6 read as follows:

"Section 46 of Article V of the constitution of the state of Colorado is amended to read:

"Section 46. Senatorial and representative districts. The state shall be divided into as many senatorial and representative districts as there are members of the senate and house of representatives respectively. EACH district in each house SHALL HAVE a population DEVIATING NO MORE THAN FIVE PERCENT FROM THE MEAN.

"Section 48 of Article V of the constitution of the state of Colorado is amended to read:

"Section 48. Revision and alteration of districts. (1) NO LATER THAN THE REGULAR SESSION IMMEDIATELY following official publication of each federal enumeration of the population of the state, INCLUDING SUCH FEDERAL CENSUS STATISTICS THAT ARE NECESSARY TO REDISTRICT, the general assembly shall establish or revise and alter the boundaries of senatorial and representative districts according to the provisions of sections 46 and 47 OF THIS ARTICLE. After forty-five days from the beginning of each such regular session, no member of the general assembly shall be entitled to or earn any compensation for his services or receive any payment for salary or expenses, nor shall any member be eligible to succeed himself in office unless and until such revision and alteration shall have been made.

"(2) Each paragraph, sentence, and clause of sections 45, 46, 47 and 48 OF THIS ARTICLE shall be deemed to be severable from all other parts thereof and shall be interpreted to preserve, as the primary purpose thereof, the creation of single member districts. Nothing in said sections shall affect the validity of laws at any time enacted by the general assembly or by the people on any subject not directly pertaining to legislative districting or apportionment."

In part Amendment No. 9 may be paraphrased as follows: That Section 46 be amended to allow for no more than 5% deviation between the most populous and the least populous district in each House; that Section 47 be amended so that there are additional requirements in the creation of legislative districts (such as ethnic, cultural, economic and demographic factors); that Section 48 be repealed and reenacted to establish a reapportionment commission consisting of eleven members to be appointed and having specified qualifications; and that such commission shall adopt a plan fixing boundaries of senatorial and representative districts after each federal census of the United States.

Amendment No. 9 continues as follows:

"Within ninety days after the commission has been convened or the necessary census data are available, whichever is later, the commission shall publish a preliminary plan for reapportionment of the members of the general assembly and shall hold public hearings thereon in several places throughout the state within forty-five days after the date of such publication. Within forty-five days after the completion of such hearings, the commission shall finalize its plan and submit the same to the Colorado supreme court for review and determination as to compliance with section 46 and 47 of this article. Such review and determination shall take precedence over other matters before the court. The supreme court shall adopt rules for such proceedings and for the production and presentation of supportive evidence for such plan. The supreme court shall either approve the plan or return the plan and the court's reasons for disapproval to the commission. If the plan is returned, the commission shall revise and modify it to conform to the court's requirements and resubmit the plan to the court within twenty days. If the plan is approved by the court, it shall be filed with the secretary of state for implementation no later than March 15 of the second year following the year in which the census was taken. The commission shall keep a public record of all the proceedings of the commission and shall be responsible for the publication and distribution of copies of each plan."

H. B. 1078 provides for the amendment of boundary lines in Representative Districts 40, 64 and 65. In submitting the interrogatories the Senate's principal purpose is to obtain an opinion as to the constitutionality of H. B. 1078.

We have considered four alternatives:

1. To declare Amendment No. 6 valid and Amendment No. 9 invalid.

2. To hold No. 9 valid and No. 6 invalid.

3. To adopt the position of the Attorney General and rule that both amendments are valid and can exist in harmony.

4. To rule that both amendments were validly adopted, but are so in conflict that each must fall.

We adopt the second alternative.

### I.

■ All those appearing before us in this matter are in agreement that the answer to Interrogatory No. 1 should be in the negative and that the answer to Interrogatory No. 2 should be in the affirmative. We concur.

Interrogatory No. 1 poses the question as to whether Amendment No. 9 became invalid because its ballot title and submission clause were not published in advance of the time that a qualified elector must file a motion for a change of wording and a hearing thereon. Section 1-40-102(3), C.R.S. 1973.[2]

■ Interrogatory No. 2 inquired as to whether Amendment No. 9 was valid even though there were minor differences between the text as submitted to the Secretary of State and the text contained in the petitions which were circulated.

### II.

■ We address ourselves to the question as to whether the two amendments are in conflict. In doing so, we are fully mindful that it is our duty, whenever possible, to give effect to the expression of the will of the people contained in constitutional amendments adopted by them. We have concluded that the two amendments are in conflict. The test for the existence of a conflict is: Does one authorize what the other forbids or forbid what the other authorizes? *Ray v. City and County of Denver,* 109 Colo. 74, 121 P.2d 886.

The first direct, material conflict comes from the designation of the entity which acts with respect to reapportionment. Amendment No. 6, in what was advertised as a housekeeping amendment, among many other things, provides that "the General Assembly shall establish . . . the boundaries of senatorial and representative districts . . . ." Amendment No. 9, on the other hand, deals exclusively with reapportionment, and under it a commission promulgates a plan of reapportionment, which this court either approves or, in effect, orders modified as required by the court.

The second direct, substantial conflict is that under No. 9 there may be up to a 5% deviation between the most populous and the least populous district in each House, while under No. 6, providing for 5% deviation from the mean, the allowable deviation between the districts is 10%.

---

[2]In *Colorado Project-Common Cause v. Anderson,* 177 Colo. 402, 495 P.2d 218, other provisions of this statute were held unconstitutional.

In both instances, one forbids what the other permits and the differences are irreconcilable.

### III.

We now reach the principal proposition of whether Section 1-40-113, C.R.S. 1973, is applicable when two constitutional amendments adopted simultaneously are in material, direct conflict. *Colo. Const.* Art. V, §1 provides in part:

"The legislative power of the state shall be vested in the general assembly consisting of a senate and house of representatives, both to be elected by the people, but the people reserve to themselves the power to propose laws and amendments to the constitution and to enact or reject the same at the polls independent of the general assembly . . . ."

In enacting section 1-40-113, which provides that "in case of adoption of conflicting provisions, the one which receives the greatest number of affirmative votes shall prevail," the Colorado legislature, anticipating the precise situation present here, acted to insure that the will of the people would be manifested. We recall the wisdom of Chief Justice John Marshall that "we must never forget that it is a *constitution* we are expounding." *McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 406 4 L. Ed. 547. There he pointed out that the legislative branch can and should give flesh and body to a constitutional provision. And while the Colorado Constitution certainly guarantees the right of initiative and referendum to the people, the legislature may, so long as it does not diminish these rights, enact provisions regarding their exercise. It is a fundamental principal of constitutional law that "Every presumption in favor of the validity of questioned legislation is indulged in by courts in testing its constitutionality." *Allardice v. Adams County,* 173 Colo. 133, 476 P.2d 982, 990.

We have the view that the statute enhances rather than limits the right of the people to amend our constitution. In *Colorado Project Common Cause v. Anderson,* 178 Colo. 1, 495 P.2d 220, this court struck down a statute restricting the right to circulate and sign petitions for initiative. We there stated:

"The initiative provisions are expressly declared to be self-executing, and, as such, *only legislation which will further the purpose of the constitutional provision or facilitate its operation, is permitted.*" 178 Colo. at 5, 495 P.2d at 221-22 (emphasis added).
*See also Yenter v. Baker,* 126 Colo. 232, 248 P.2d 311.

If this statute is not permitted to operate in this case, the people will be left without either amendment to the constitution. On the other hand, if the statute is allowed to operate as the legislature intended, Amendment No. 9, the recipient of the greatest popular support, will be given effect as the expression of the predominant will of the people. Viewed in this perspective, there is no question that this statute enhances rather than restricts the right of the people to amend the constitution.

This interpretation is not only consistent with the legislative mandate and in furtherance of the principles of initiative and referendum,

it is the only interpretation that is consistent with Article IV, Section 4 of the United States Constitution. That section, which guarantees "to every state in this Union a republican form of government," must, at the very least, mean that the "supreme power resides in the body of the people." *Chisholm v. Georgia,* 2 U.S. (2 Dall.) 419, 457, 1 L.Ed. 440. Therefore, since popular sovereignty and concepts of republicanism are inextricably bound together, and, since Amendment No. 9 is the clearest expression of the former, it must, consistent with the most fundamental principles of the federal constitution, prevail.

We find no relevance to the argument made by the proponents of Amendment No. 6 that the provisions of *Colo. Const.* Art. V, §1 contain the phrase "that it shall be in all respects self-executing." This merely means that the power of initiative and referendum rests with the people whether or not the legislature implements the power. It does not prevent the legislature from enacting legislation which will strengthen that power.

As we view it, even if the legislature had not passed such legislation, or did not have authority to do so, we would feel bound to hold that in order to carry out the meaning and purpose of Art. V, §1, the one of two inconsistent amendments which received the most votes must prevail. That, in our view, is what the "republican" form of government means with respect to the right of the people to amend the constitution.

We recognize that several courts have made statements as dicta as in *Opinion to the Governor,* 78 R.I. 144, 80 A.2d 165, where it was said:

"In such a case [of conflicting amendments adopted on the same day] the law is well settled that both amendments must fall as it is impossible to know the final will of the electors and to give it effect. 1 Cooley Con. L. (8th ed.) chap. IV, P. 130."

There the court finally concluded that the amendments being construed were not in conflict. *See also State ex rel. Nelson v. Jordan,* 104 Ariz. 193, 450 P.2d 383; *Utter v. Moseley,* 16 Idaho 274, 100 P. 1058; *McBee v. Brady,* 15 Idaho 761, 100 P. 97; *In re Senate File No. 31,* 25 Neb. 864, 41 N.W. 981.

We find significance in the fact that neither counsel nor we have been able to find an instance in which the court actually struck down both amendments. In the light of our views already expressed, we reject the dicta.

### IV.

We now reach the contention advanced by the proponents of Amendment No. 6 that Amendment No. 9 is in violation of the doctrine of separation of powers and that this separation is guaranteed to the states by *U.S. Const.* Art. IV, §4.

The effect of Amendment No. 9 is to place significant power of reapportionment in this court, in that it provides that any reapportionment plan must be submitted by the commission to this court, which can either approve or in effect order modifications. It is argued that this is not a judicial function, and that Amendment No. 9 is invalid because it constitutes

a violation of the doctrine of separation of powers.

■ Under our state constitution there is no such violation. Article III thereof provides:

"The powers of the government of this state are divided into three distinct departments, — the legislative, executive and judicial; and no person or collection of persons charged with the exercise of powers properly belonging to one of these departments shall exercise any power properly belonging to either of the others, *except as in this constitution expressly directed or permitted.*" (Emphasis added.)
Amendment No. 9 expressly directs and permits this action by this court.

Therefore, if there is a constitutional doctrine of separation of powers which will defeat Amendment No. 9, it must be found in the United States Constitution. The latter document contains no express provision requiring that the doctrine of separation of powers be applied to the states. It does provide:

"The United States shall guarantee to every state in this Union a republican form of government, and shall protect each of them against invasion; and on application of the legislature or of the executive (when the legislature cannot be convened) against domestic violence."*U.S. Const.* Art. IV, §4.

We hold that the doctrine of separation of powers does not prevent the judicial branch from acting as is provided in Amendment No. 9. The Proponents of Amendment No. 9 have listed eight states which have injected the judicial or executive branches of government into the reapportionment function: "Alaska Const. Art. VI . . . Arkansas Const. Art. VIII . . . Hawaii Const. Art. III . . . Illinois Const. Art. IV . . . Missouri Const. Art. III . . . New Jersey Const. Art. IX, Sec. V . . . Oklahoma Const. Art. V, Sec. 11 . . . Oregon Const. Art. IV, Sec. 6 . . . ."

The commission created by Amendment No. 9 is to be composed of four legislators or their designees, three members appointed by the Governor, and four members appointed by the Chief Justice of the Supreme Court. The Commission is to draw up a plan of reapportionment which is to be reviewed by the Colorado Supreme Court for the purpose of determining whether it complies with the state and federal constitutional requirements. The proponents of Amendment No. 6 view the involvement of the judiciary in what they deem an inherently legislative function as contravening the federal constitution.

■ First, it cannot be grounds for objection that the Colorado Supreme Court exercises ultimate review of the apportionment plan to determine whether it comports with the United States Constitution, or the Colorado Constitution, since such review is, and has always been, a judicial function. *See Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60. Secondly, although reapportionment is normally a legislative function, since it has been handled in other ways by other state constitutions and has been upheld, this scheme cannot be objected to on the ground that the Chief Justice appoints four members to the commission. *See Wade v.*

*Nolan,* 414 P.2d 689 (Alaska); *Faubus v. Kinney,* 239 Ark. 443, 389 S.W.2d 887; *Baum v. Newbry,* 200 Ore. 576, 267 P.2d 220.

Even if it were conceded that the involvement of the judiciary in the reapportionment commission encroached upon an inherently legislative function, such an encroachment would in no way violate any federally protected right. It is true that the doctrine of the separation of powers is extremely important and fundamental to both our federal and state governments, (*i.e., Colo. Const.* Art. III), but we cannot agree with the proponents of Amendment No. 6 that the doctrine is guaranteed to the states by *U.S. Const.* Art. IV, §4.

Article IV, Section 4, in relevant part, states:

"Republican form of government — protection of states. The United States shall guarantee to every state in this Union a republican form of government, and shall protect each of them against invasion . . . ."

The crucial question, therefore, is whether the concept of a republican form of government embodies within it the doctrine of the separation of powers.

Relevant United States Supreme Court cases indicate that the Guaranty Clause does not require a particular distribution of power within a state. While not specifically referring to Article IV, Section 4, the first Mr. Justice Harlan in *Dreyer v. Illinois,* 187 U.S. 71, 84, 23 S. Ct. 28, 32, 47 L. Ed. 79, 84 stated:

"Whether the legislative, executive and judicial powers of a State shall be kept altogether distinct and separate, or whether persons or collections of persons belonging to one department may, in respect to some matters, exert powers which, strictly speaking, pertain to another department of government, is for the determination of the State."

*See Sweezy v. New Hampshire,* 354 U.S. 234, 77 S. Ct. 1203, 1 L.Ed. 2d 1311; *International Brotherhood v. Hanke,* 339 U.S. 470, 70 S. Ct. 773, 94 L. Ed. 995. In *Highland Farms Dairy v. Agnew,* 300 U.S. 608, 57 S. Ct. 549, 81 L. Ed. 835, the Supreme Court, per Mr. Justice Cardozo, had occasion to confront directly the question of whether Article IV, Section 4 embodies within it a guarantee of a particular distribution of power. Rejecting such a notion, the court stated:

"How power shall be distributed by a state among its governmental organs is commonly, if not always, a question for the state itself." 300 U.S. at 612.

The thrust of these cases — that Article IV, Section 4 does not embody within it a guarantee of a particular distribution of power within a state — is fully supported by review of the debates at the constitutional convention, and by the various commentators on the constitution.

We point out that not once during the constitutional debates surrounding the adoption of Article IV, Section 4 was the doctrine of separation of powers mentioned. In fact, the main concern of the framers in adopting this section was expressed by Governor Randolph, as set out in *Yates' Minutes* for June 11, 1787:

"Mr. RANDOLPH was for the present amendment, because a republican government must be the basis of our national Union; and *no state in it ought to have it in their power to change its government into a monarchy."* J. Elliott, I *Debates on the Federal Constitution* 406 (1836) (Emphasis added.)

Another concern of the framers was expressed by Mr. Wilson as set out in *Madison's Minutes* for July 18, 1787:

"Mr. Wilson. The object is merely to secure the States agst. dangerous commotions, insurrections and rebellions." *M. Farrand,* II *The Records of the Federal Convention of 1787,* 47 (1911).

Thus, the framers did not tie Article IV, Section 4 into the doctrine of separation of powers.

Neither does the novel view urged by the proponents of Amendment No. 6 find any support in *The Federalist.* In No. 39 Madison poses the question: "What then, are the distinctive characters of the republican form?" The answer which we have herein set forth in full, nowhere indicates that the separation of powers is included. Madison states:

"[W]e may define a republic to be, or at least may bestow that name on, a government which derives all its powers directly or indirectly from the great body of the people, and is administered by persons holding their offices during pleasure, for a limited period, or during good behavior. It is ESSENTIAL to such a government that it be derived from the great body of the society, not from an inconsiderable proportion, or a favored class of it; otherwise a handful of tyrannical nobles, exercising their oppressions by a delegation of their powers, might aspire to the rank of republicans, and claim for their government the honorable title of republic. It is SUFFICIENT for such a government that the persons administering it be appointed, either directly or indirectly, by the people; and that they hold their appointments by either of the tenures just specified; otherwise every government in the United States, as well as every other popular government that has been or can be well organized or well executed would be degraded from the republican character." I *The Federalist* No. 39, at 257 (M. Dunne ed. 1901) (J. Madison).

Furthermore, in referring specifically to the Guaranty Clause in No. 43, Madison went on to state:

"In a confederacy founded on republican principles, and composed of republican members, the superintending government ought clearly to possess authority to defend the system against aristocratic or monarchical innovations . . . . But the authority extends no further than to a GUARANTY of a republican form of government . . . . Whenever the States may choose to substitute other republican forms, they have a right to do so, and to claim the federal guaranty for the latter . . . ." I *The Federalist* No. 43, *supra* at 297-98.

Finally, in *The Federalist* No. 47, where Madison specifically dealt with the separation of powers doctrine, he noted that every state constitution then in existence had, to some extent, overlapped the functions of the

three branches of government. Furthermore, the entire thrust of No. 47 was Madison's belief that a relaxation of a rigid separation of powers, and an overlapping of the various functions, was indeed necessary for a workable governmental scheme. This view was reaffirmed almost half a century later by Story in his commentary on the Constitution. Commenting on the meaning of the separation of powers, he stated:

"But when we speak of a separation of the three great departments of government, and maintain that that separation is indispensable to public liberty, we are to understand this maxim in a limited sense. It is not meant to affirm that they must be kept wholly and entirely separate and distinct, and have no common link of connection or dependence, the one upon the other, in the slightest degree. *The true meaning is, that the whole power of one of these departments should not be exercised by the same hands which possess the whole power of either of the other departments; and that such exercise of the whole would subvert the principles of a free constitution.*" *J. Story, I Commentaries on the Constitution of the United States* 393 (5th ed. 1891) (Emphasis added.)

From the foregoing, one would be hard pressed to conclude that the separation of powers doctrine and the concept of republicanism are inextricably united.

Proponents of Amendment No. 6 rely heavily on the Kansas case of *Van Sickle v. Shanahan,* 212 Kan. 426, 511 P.2d 223, which they contend holds that the doctrine of separation of powers is an inherent and integral element of the republican form of government expressly guaranteed by Article IV, Section 4. In fact, *Shanahan* is supportive and directly in point with the result we reach here. For there, the Kansas Supreme Court held that while the constitutional amendment in question indeed vests some legislative powers in the Governor, it did not do so to the extent that it vested the whole power of the legislature in the Governor. It held therefore that the amendment *was* constitutional and did *not* violate the separation of powers doctrine. If *Shanahan* were an opinion of the United States Supreme Court, it would direct this court to make the very conclusion that we reach here.

Nevertheless, in order not to mislead, we wish to reiterate what we have expressed on countless occasions from the bench: the separation of powers concept is extremely important, and fundamental to our free system of government. We are unalterably opposed to any attempt by one branch of the government to assume the power of another. But when the people speak through the amendment of their constitution and assign one branch or the other some duties which are not normally considered to be that of the branch assigned, then because of our devotion to the republican scheme of government, we are compelled to accept their decision.

## V.

The Attorney General would have separate reapportionment plans made by the General Assembly (under Amendment No. 6) and the commission (under Amendment No. 9); and then have this court act with

respect to both plans as provided in No. 9. We think such a holding on our part would constitute judicial legislation and judicial amendment of the constitution. We, therefore, do not accept this argument.

### VI.

We now address ourselves as to the validity of H. B. 1078. It must be born in mind that Amendment No. 9 provides, "The Constitution of the State of Colorado is hereby amended and shall read as follows:" There follows a complete rewording of *Colo. Const.* Art. V, §§46, 47 and 48. The provisions of the former sections with these numbers have been superseded and are no longer in existence. The only authority, therefore, under which the General Assembly could enact H. B. 1078 must be found in the new sections 46, 47 and 48. Such authority not only is not there, but the provisions negate any such power in the General Assembly.

Further, Amendment No. 9 sets forth clearly the will of the people that there be no reapportionment between the lives of commissions created after each federal census. Under its provision a commission ceases to exist following the filing of its approved reapportionment plan, and a successor commission does not come into an existence until after the next federal census. The people directed that there be no intervening reapportionment. It follows that H. B. 1078, if enacted, would be unconstitutional.

### VII.

We wish to make clear that Amendment No. 6 related to many subjects other than *Colo. Const.* Art. V, §§ 46 and 48. Each of the subjects appear to be severable. In any event, the propositions with respect to §§ 46 and 48 are severable from the remainder of Amendment No. 6. Expressly, we do not pass upon any other portions of Amendment No. 6.

### VIII.

We believe that the foregoing gives sufficiently complete answers to all of the Interrogatories.

## APPENDIX

## INTERROGATORIES CONTAINED IN SENATE RESOLUTION NO. 17

1. Section 1-40-102(3), Colorado Revised Statutes 1973, permits any qualified elector who is not satisfied with the titles and submission clauses of proposed initiated measures to file a motion with the secretary of state, within forty days after such titles and submission clauses are fixed, for a rehearing on the wording of any such title or submission clause. If there is no public notice or publication apprising the public that a title and submission clause has been fixed, whereby the qualified electors may know of and, if desired, to object to the same within such forty days and ask for a rehearing on the wording thereof, does the lack of such notice or publication invalidate the initiated measure?

Answer to Interrogatory No. 1: No.

2. Is Amendment No. 9 valid even though the text thereof, as submitted to the Secretary of State, differed from the text thereof contained in the petitions circulated therefor? In the former, the amendment to Section 47(2) of Article V of the state constitution reads, in part, as follows:

"(2) Except when ~~declared by the general assembly to be~~ necessary to meet the equal population requirements of section 46, no part of one county shall be added to all or part of another county in forming districts. WITHIN COUNTIES WHOSE TERRITORY IS CONTAINED IN MORE THAN ONE DISTRICT OF THE SAME HOUSE, THE NUMBER OF CITIES AND TOWNS WHOSE TERRITORY IS CONTAINED IN MORE THAN ONE DISTRICT OF THE SAME HOUSE SHALL BE AS SMALL AS POSSIBLE . . . .";

and the amendment to said Section 47(2), as printed in the petition reads, in part, as follows:

"(2) Except when ~~declared by the general assembly~~ to be necessary to meet the equal population requirements of section 46, no part of one county shall be added to all or part of another county in forming districts WITHIN COUNTIES WHOSE TERRITORY IS CONTAINED IN MORE THAN ONE DISTRICT OF THE SAME HOUSE, THE NUMBER OF CITIES AND TOWNS WHOSE TERRITORY IS CONTAINED IN MORE THAN ONE DISTRICT OF THE SAME HOUSE SHALL BE AS SMALL AS POSSIBLE . . . ."

Certified copies of said filing and said petitions are attached as an appendix to this Resolution.

Answer to Interrogatory 2: Yes.

3. Do the provisions of Section 1-40-113, Colorado Revised Statutes 1973, providing that in case of conflicting measures the one receiving the greatest number of affirmative votes shall prevail, control the construction of conflicting amendments to the state constitution?

Answer to Interrogatory 3: Yes.

4. Do the provisions of Amendment No. 9 amending Section 48 of Article V of the state constitution, providing for apportionment of members of the General Assembly by a Colorado reapportionment commission, conflict with the provisions of Amendment No. 6, amending the same section to provide guidelines for the apportionment of such members by the General Assembly?

Answer to Interrogatory 4: Yes.

5. If the answer to question number 4 is in the affirmative, do the provisions of said Amendment No. 9 control over those of Amendment No. 6 amending the same section?

Answer to Interrogatory 5: Yes.

6. Do the provisions of Amendment No. 9, amending Section 46 of Article V of the state constitution to provide a maximum population deviation of five percent between the most populous and the least populous legislative districts, conflict with the provisions of Amendment No. 6, amending the same section to provide for a maximum deviation of five

percent from the mean?

Answer to Interrogatory 6: Yes.

7. If the answer to question number 6 is in the affirmative, do the provisions of said Amendment No. 9 control over those of Amendment No. 6 amending the same section?

Answer to Interrogatory 7: Yes.

8. If Amendment No. 9 is valid and the provisions thereof control over the provisions of Amendment No. 6, where in conflict, may the General Assembly constitutionally enact House Bill No. 1078, amending the current apportionment statute prior to the establishment and operation of a Colorado reapportionment commission after the next federal census, pursuant to the provisions of Amendment No. 9?

Answer to Interrogatory 8: No.