Ralph **CLARK**, Julie B. Chugg, Wilson B. Croom, and Mary Thurber, in their capacity as designated representatives of the signers of a referendum petition, Plaintiffs–Appellees,

v.

The **CITY OF AURORA**, Counties of Adams and Arapahoe, State of Colorado, a municipal corporation; John Tasker, in his official capacity as City Clerk of the City of Aurora; Donna L. Young, in her official capacity as Deputy City Clerk of the City of Aurora; and City Council of the City of Aurora; Dennis Champine, Steve Bobrick, Frank Weddig, Peggy Kearns, Barbara

Loucks, Linda Capra, Steven Hogan, Elsie Lacy and Paul Tauer, Defendants–Appellants.

No. 88SA161.

Supreme Court of Colorado,
En Banc.

Nov. 13, 1989.

Charles H. Richardson and Christopher K. Daly, Aurora, for defendants-appellants.

No appearance by plaintiffs-appellees.

Chief Justice QUINN delivered the Opinion of the Court.

The question in this case is whether sections 14–12(b) and 14–13(b) of the City Code of Aurora, which require a qualified registered elector who signs a referendum petition to print his or her name after the signature and other information pertaining to residence and to designate the date of signing the petition, impose unconstitutional restrictions on the power of referendum reserved to the people by article V, section 1 of the Colorado Constitution. The district court invalidated several portions of the ordinances as facially unconstitutional and held that the city clerk improperly relied upon them in invalidating various signatures on a referendum petition directed to suspending the operation of a municipal tax. We conclude that the Aurora ordinances are not facially unconstitutional as violative of the right of referendum guaranteed by the Colorado constitution, and, therefore, we reverse the judgment of the district court and remand the case to that court for further proceedings.[1]

I.

The City of Aurora is a home rule municipality located in both Adams County and Arapahoe County. Article VI of Aurora's city charter states that the power of referendum, with certain exceptions not applicable here,[2] shall apply to all ordinances

---

1. Because the district court declared a municipal ordinance unconstitutional, appellate jurisdiction lies in this court rather than in the court of appeals. § 13–4–102(1)(b), 6A C.R.S. (1987).

2. The exceptions to the referendum process are "ordinances fixing the rate of taxation on property each year for municipal purposes, making the annual appropriation, calling a special election, or ordering improvements initiated by petition and to be paid for by special assessments." *Aurora Home Charter* art. V, § 6–4 (1961).

passed by the city council, and further states as follows:

> If at any time within thirty days after the final passage of an ordinance to which the referendum is applicable, a petition signed by qualified electors equal in number to at least ten (10) percent of the total vote cast in the last regular municipal election is presented to the [city] council protesting any ordinance, the same shall thereupon be suspended and the council shall reconsider such ordinance; and if the same be not entirely repealed, shall submit the same to a vote of the qualified electors of the city in a manner as provided in respect to the initiative at the next regular municipal election, or at a special election called therefor. Such ordinance shall then go into effect if a majority of the qualified electors voting thereon vote in favor thereof, without further publication.

*Aurora Home Rule Charter*, art. VI, § 6-4 (1961).

On October 27, 1986, the city council passed ordinance 86–153, which imposed a three and one-half percent sales tax on candy and soft drinks sold within the city, with an effective date of February 1, 1987. The taxing ordinance became the subject of a referendum petition filed with the city clerk on November 26, 1986.[3] The referendum petition sought, pursuant to Aurora's city charter, a reconsideration of the ordinance by city council and, if not repealed on reconsideration, a vote of the qualified municipal electors. Since there were 10,974 votes cast in Aurora's last regular municipal election, 1,097 valid signatures were required for the referendum petition to be effective.

The Aurora City Code requires that a referendum petition be circulated by a qualified registered elector, who must attach to the petition a notarized affidavit stating that "to the best of the circulator's knowledge and belief each person signing the petition was at the time of signing a qualified registered elector." *Aurora City Code* §§ 14–12(b)(5) and 14–12(d) (1979).[4] The city clerk is prohibited from accepting any petition that lacks the requisite affidavit. *Aurora City Code* § 14–12(c) (1979). After a referendum petition is filed, the city clerk must review the petition and, if the clerk finds it to be sufficient, must attach a "certificate of sufficiency" to the petition and present it to the city council. *Aurora City Code* § 14–11(d) (1979).

Sections 14–12(b) and 14–13(a) of the city code, which are central to this litigation, provide the standards which the city clerk is to employ in determining the sufficiency of a referendum petition. Section 14–12(b) states, in pertinent part, as follows:

> Any ... referendum petition circulated within the city shall be signed by qualified registered electors by their own signature, after which the signer shall print his name, his place of residence, including his house and/or apartment number, street address, city, county, and the date of signing same. Signatures which do not contain all the information required

---

**3.** The referendum petition was actually filed with the deputy city clerk, and it was the deputy city clerk who reviewed the petition and took the action later described in our opinion. Since section 14–10 of the Aurora City Code defines "city clerk" to include the deputy city clerk, we refer to the deputy city clerk as the city clerk.

**4.** Section 14–12(b) requires the attached affidavit of the circulator to state the following:

(1) The address of the circulator;

(2) That the circulator is a qualified registered elector;

(3) That the circulator actually circulated the petition;

(4) That each signature on the petition was affixed in the circulator's presence;

(5) That to the best of the circulator's knowledge and belief each person signing the petition was at the time of signing a qualified registered elector;

(6) That the circulator neither received nor entered into any contract whereby in the future the circulator will receive any money or thing of value in consideration for his circulating such petition;

(7) That the circulator has not nor will not in the future pay directly or indirectly any money or other thing of value to any signer for the purpose of inducing or causing such signer to affix a signature to the petition.

(8) That to the best of the circulator's knowledge and belief no other person has paid or will pay directly or indirectly any money or thing of value to any signer for the purpose of inducing or causing such signer to affix a signature to the petition.

by this section shall be considered invalid.

Section 14–13(a) supplements section 14–12(b) by requiring the city clerk to complete a review of the petition within ten days after its filing and to initially find signatures of individuals insufficient for the following reasons:

(1) The address subscribed by signer is not located within the city limits of the City of Aurora.

(2) A signature appears on the petition more than once. In such event all signatures of said individual shall be deleted except one.

(3) More than one individual signature on a signature line. In such event only one signature on the line is valid.

(4) An incomplete address being given by an individual (i.e., omitted designation of street, avenue, drive, court, place, way, east, west, etc.).

(5) Omission of information as to city or county.

(6) Omission of a date, an inappropriate date or incomplete date.

(7) The use of ditto marks as a substitute for any required information.

Pursuant to the city code, any qualified registered elector, within twenty days after the referendum petition has been filed with the city clerk, may file a protest "setting forth with particularity the grounds of such protest and the names protested." *Aurora City Code* § 14–14(a) (1979). Upon filing of a protest, all proceedings on the referendum are suspended until the city clerk conducts a protest hearing and determines the validity of the protest. *Aurora City Code*, §§ 14–14(b) and 14–15 (1979).

On December 4, 1986, the city clerk issued an initial certificate of insufficiency striking 859 signatures from the referendum petition. This initial certificate stated that there were 768 valid signatures on the petition, that 67 of the signatures were invalid due to the lack of qualifications of the petition circulators, and that the remaining 792 were stricken for the following reasons:

| | |
|---|---|
| No City or County | 319 |
| Date Errors | 200 |
| Street designation/Address | 164 |
| Signatures/Printed name | 65 |
| Address not in city | 26 |
| Miscellaneous | 18 |

When the city clerk finds upon initial review that a petition is insufficient as to form or the number of signatures, the city clerk is required to notify the petition circulator of the finding, whereupon the petition may be withdrawn and an amended petition may be refiled within ten days of the declaration of insufficiency. *Aurora City Code* § 14–15(c) (1979).

Following the city clerk's declaration of insufficiency, petition circulators filed an additional 613 signatures with the city clerk. On December 16, 1986 the city clerk issued a final certificate of insufficiency, declaring 483 of the additional signatures invalid. The final certificate of insufficiency stated that 209 signatures were stricken due to the lack of qualifications of the petition circulators, and another 274 signatures were stricken for the following reasons:

| | |
|---|---|
| No city or county | 96 |
| Date errors | 48 |
| Street designation/Address | 90 |
| Signatures/Printed name | 10 |
| Address not in city | 10 |
| Miscellaneous | 20 |

As a result of the city clerk's action, the referendum petition was 199 signatures short of the required minimum of 1,097.

On January 15, 1987, four qualified and registered electors of the City of Aurora—Ralph Clark, Judy P. Chugg, Wilson B. Croom, and Mary B. Thurber—filed a complaint in the District Court of Arapahoe County in their capacity as designated representatives of the signers of the referendum petition. Named as defendants were the City of Aurora, members of the city council, and the city clerk. The plaintiff electors requested the court to order the city clerk to withdraw the final certificate of insufficiency and to issue a certificate of sufficiency on the basis that sections 14–12(b) and 14–13(a) of the Aurora City Code, and the city clerk's invalidation of the signatures pursuant to these ordinances, violated the constitutional right of

referendum reserved to the people by article V, section 1 of the Colorado Constitution. In their answer to the complaint, the City of Aurora and municipal officials asserted that the challenged ordinances did not violate the constitutional right of referendum, but rather that the ordinances were necessary to preserve the integrity of the referendum process with respect to municipal legislation.

The case was submitted to the court on undisputed facts, and on August 27, 1987, the district court ruled on the facial constitutionality of the Aurora ordinances.[5] The district court initially noted that the city clerk struck the following number of signatures, totalling 726, from the petition for the reasons indicated: 17–no signature; 50–no printed name; 17–out of city; 139–no county listed; 74–no city listed; 65–no city/no county listed; 2–no county/complete date; 6–no county/no date; 53–incomplete date/no year; 4–wrong dates; 85–no date; 2–illegible; 13–no date on entire page; 10–ditto marks; 1–P.O. box for address; 188–no street designation. The court then stated that the city clerk was justified in invalidating those entries which contained no signature at all, entries which involved an illegible signature, those which contained a signature followed by a post office box for an address, those which contained a signature followed by no street designation at all, those which contained a signature followed by an address outside the city, and entries which contained a signature followed by a wrong ·date. The district court, however, was of the view that in other instances involving an incomplete address the voting qualifications of the signer "may be easily verified by comparing the name, address, and signature with those of registered voters on the County Clerk's voter registration list" and,

hence, "[a]ny confusion as to the registered voter's identity can be readily determined by a comparison of street address and signature on the voter registration list to prevent fraud." The court accordingly declared the following parts of section 14–12(b) facially unconstitutional as impermissible restrictions on the right of referendum: the requirement that a petition signer print his or her name after the signature; the requirement that a petition signer include his or her house and/or apartment number in the street address; and the requirement that the petition signer designate the city and county of residence as part of the address. The court also invalidated as unconstitutional on their face the following subparts of section 14–13(a), which required the city clerk to initially find a signature insufficient for the following reasons: subpart 14–13(a)(4)—"[a]n incomplete address being given by an individual (i.e., omitted designation of street, avenue, drive, court, place, way, east, west, etc.)"; subpart 14–13(a)(5)—"[o]mission of information as to city or county"; and subpart 14–13(a)(7)—"[t]he use of ditto marks as a substitute for any required information." As a result of its ruling of unconstitutionality, the court ordered the city clerk to recertify the sufficiency of the referendum petition without regard to those parts of section 14–12(b) and 14–13(a) which the court invalidated.

In challenging the district court's judgment, the city argues that the Aurora ordinances, rather than impermissibly constraining the right of referendum, actually enhance the integrity of the referendum process by preventing mistake, fraud, and other abuses in the orderly processing of a referendum petition. Before addressing the merits of the city's argument, we briefly review those long-standing principles of

In the district court, the plaintiff electors also requested a preliminary injunction prohibiting the city from enforcing and collecting the municipal sales tax on candy and soft drinks imposed by ordinance 86–153. The district court took testimony on the motion and denied the request for injunctive relief. The parties elected to stand on the evidence submitted at the injunction hearing.

In its memorandum submitted to the district court on the constitutionality of the Aurora ordinances, the city conceded that the city clerk improperly invalidated 37 signatures on the basis of an erroneous determination that the petition circulator who obtained those signatures was not a qualified registered elector. Even with the concession, however, the referendum petition would still have lacked 162 signatures to be declared sufficient.

constitutional adjudication which must inform our decision in this case.

## II.

Under the Colorado Constitution all political power derives from the people and is vested in them. Colo. Const. art. II, § 1. Two forms of political power expressly reserved to the people are the initiative and the referendum. Colo. Const. art. V, § 1. The initiative refers to the process by which the people propose laws by petition for enactment or rejection at the polls. Colo. Const. art. V, § 1(2); *see Common Cause v. Anderson,* 178 Colo. 1, 495 P.2d 220 (1972). The referendum is a process by which a law enacted by a legislative body is referred to the electorate for ultimate rejection or approval. Colo. Const. art. V, § 1(3); *see Burks v. Lafayette,* 142 Colo. 61, 349 P.2d 692 (1960). Because these rights are fundamental in character and self-executing, Colo. Const. art. V, § 1(10), they must be liberally construed so as to effectuate their purpose and facilitate their operation. *Common Cause,* 178 Colo. at 5, 495 P.2d at 221–22; *see, e.g., Urevich v. Woodard,* 667 P.2d 760, 762 (Colo.1983); *Margolis v. District Court,* 638 P.2d 297, 302 (Colo.1981); *McKee v. City of Louisville,* 200 Colo. 525, 530, 616 P.2d 969, 972

(1980). This principle of liberal construction, however, is not intended to prohibit a legislative body from prescribing procedures relating to the proper exercise of the initiative and referendum. On the contrary, the Colorado Constitution charges the General Assembly with the responsibility to "pass laws to secure the purity of elections, and guard against abuses of the elective franchise." Colo. Const. art. VII, § 11. Consistent with this constitutional charge, article V, in reserving the powers of initiative and referendum to the people, requires petitions with respect to state laws to be filed with the secretary of state "in such form as may be prescribed pursuant to law." Colo. Const. art. V, § 1(2) and (3). Thus, "while the Colorado Constitution certainly guarantees the right of initiative and referendum to the people, the legislative body may, so long as it does not diminish these rights, enact provisions regarding their exercise." *In re Interrogatories by Senate,* 189 Colo. 1, 8, 536 P.2d 308, 314 (1975).[6] The prevention of mistake, fraud, and other abuses in the initiative and referendum processes, therefore, are clearly within the legislative domain. *Brownlow v. Wunsch,* 103 Colo. 120, 123, 83 P.2d 775, 777 (1938).

**6.** In *In re Interrogatories By Senate,* we determined that a constitutional ballot measure which received the greatest number of affirmative votes prevailed over a conflicting constitutional ballot measure that received a lesser number of votes. Drawing upon section 1–40–113, 1B C.R.S. (1980), we observed as follows:

In enacting section 1–40–113, which provides that "in case of adoption of conflicting provisions, the one which receives the greatest number of affirmative votes shall prevail," the Colorado legislature, anticipating the precise situation present here, acted to ensure that the will of the people will be manifested. We recall the wisdom of Chief Justice Marshall that "we must never forget that it is a *constitution* we are expounding." *McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 406, 4 L.Ed. 579. There he pointed out that the legislative branch can and should give flesh and body to a constitutional provision. And while the Colorado Constitution certainly guarantees the right of initiative and referendum to the people, the legislature may, so long as it does not diminish these rights, enact provisions regarding their exercise. It is a fundamental principle of constitutional law that "Every presump-

tion in favor of the validity of questioned legislation is indulged in by courts in testing its constitutionality." *Allardice v. Adams County,* 173 Colo. 133, 476 P.2d 982, 990 [1970].

\* \* \* \* \* \*

If this statute is not permitted to operate in this case, the people will be left without either amendment to the constitution. On the other hand, if the statute is allowed to operate as the legislature intended, Amendment No. 9, the recipient of the greatest popular support, will be given effect as the expression of the predominant will of the people. Viewed in this perspective, there is no question that this statute enhances rather than restricts the right of the people to amend the constitution.
189 Colo. at 8, 536 P.2d at 314.

Further confirmation of the legislative responsibility to ensure the proper exercise of the rights of initiative and referendum is found in the language of article V, section 1(2) and (3) of the Colorado Constitution, which requires petitions with respect to state laws to be filed with the secretary of state "in such form as may be prescribed pursuant to law."

■ The powers of initiative and referendum reserved to the people by article V of the Colorado Constitution are also reserved to the registered electors of a city with respect to municipal legislation. Article V, section 1(9) states in this respect as follows:

> The initiative and referendum powers reserved to the people by this section are hereby further reserved to the registered electors of every city, town, and municipality as to all local, special, and municipal legislation of every character in or for their respective municipalities. The manner of exercising said powers shall be prescribed by general laws; except that cities, towns, and municipalities may provide for the manner of exercising the initiative and referendum powers as to their municipal legislation. Not more than ten percent of the registered electors may be required to order the referendum, nor more than fifteen percent to propose any measure by initiative in any city, town, or municipality.

Because the powers of initiative and referendum with respect to municipal legislation are also fundamental in character, we must closely examine municipal ordinances regarding the exercise of the initiative and referendum so as to be certain that such ordinances do not diminish these basic constitutional processes. However, we also must accord some deference to the judgment of a city's governing body in fashioning procedures calculated to eliminate mistake, fraud, and other abuses and thus assure that the true will of the people will be manifested in the initiative and referendum. *See In re Interrogatories by Senate,* 189 Colo. at 8, 536 P.2d at 314. It is within the framework of these guidelines that we turn to sections 14–12(b) and 14–13(a) of the Aurora City Code.

### III.

The district court invalidated as facially unconstitutional those parts of section 14–12(b) which required a petition signer to print his or her name after the signature, the signer's house and/or apartment number, and the signer's city and county of residence. The district court's ruling, in our view, cannot be reconciled with the constitutional authority of a municipality to provide for the manner of exercising the referendum powers as to municipal legislation. Colo. Const. art. V, § 1(9). An examination of the three requirements invalidated by the district court will show that each of them serves to enhance the integrity of the referendum process by eliciting from a petition signer basic information as to identity and residence. This information if true and correct will confirm the signer's eligibility to sign the petition, and if untrue and incorrect will provide a valid basis for the striking of the signature by the city clerk or for a challenge to the signature by any qualified elector interested in the petition.[7]

### A.

■ The requirement of section 14–12(b) that a petition signer print his or her name after the signature plays an important role in the referendum process. A referendum petition must be "signed" by registered electors. Colo. Const. Art. V, § 1(3); Aurora Home Rule Charter art. VI, § 6–4 (1961). The requirement of a signa-

7. The district court in its ruling observed that the city clerk could properly invalidate those petition entries in which no signature appeared, in which a petition signer used a post office box for an address or omitted any street designation at all, and in which the wrong date of signing was given. Although these aspects of the court's ruling are not before us, we note in passing our agreement with the district court's observation with respect to these matters. Article V, § 6–4 of the Aurora Home Rule Charter requires that a referendum petition be "signed." An entry lacking a signature, therefore, does not comport with this basic requirement. So also, an entry in which the signer uses a post office box or omits any street name at all fails to provide the city clerk with even minimal identifiable characteristics about the signer's eligibility to vote. Finally, in regard to the requirement that the petition signer designate the "date of signing," we point out that Article VI, § 6–4 of Aurora's charter requires a referendum petition to be signed within thirty days after final passage of an ordinance to which the petition is directed. The "date of signing" requirement of section 14–12(b) is designed to enable the city clerk to determine whether the referendum petition was timely signed in accordance with the charter provision.

ture is satisfied when it is identifiable as the signature of the person whose name it purports to be. *Brownlow*, 103 Colo. 133–34, 83 P.2d at 781. When, as is often the case, a signature is illegible or partially legible, the printing of the name after the signature permits the clerk to determine the identity of the signer and to check the signature on the petition against the voter registration record. If the clerk is reasonably satisfied by such examination that the signature on the petition and the signature on the voter registration record are those of the same person, the signature on the petition should be approved. The requirement of a printed name after the signature serves not only to guard against fraud in the petition process but also achieves the salutary goal of preventing the invalidation of an otherwise illegible or partially legible signature.[8]

### B.

■ The district court ruled that the portion of section 14–12(b) which required the signer to print "his house and/or apartment number" unconstitutionally abridged the right of referendum. The district court was of the view that any confusion regarding the voter's qualifications as the result of an incomplete address on a petition could be easily resolved by comparing the entry in the petition with the voter registration list in the county clerk's office. We reject the district court's invalidation of this requirement.

"The listing of an address is admittedly of critical significance when residency within an electoral district is an indispensable prerequisite to voting." *Erickson v. Blair*, 670 P.2d 749, 756 (Colo.1983); *see* § 1–40–106(2), 1B C.R.S. (1989 Supp.) (each registered voter signing referendum petition on matter of state law "shall print ... the address at which he resides, including

the street number and name.") The Aurora City Code states that the provisions of the Colorado Municipal Election Code [now codified at section 31–10–101 to 31–10–1539, 12B C.R.S. (1986 & 1988 Supp.)] apply to and govern all city elections. *Aurora City Code* § 14–1 (1979). Pursuant to section 31–10–201(1) of the Colorado Municipal Election Code, every person who has attained the age of eighteen years is entitled to register to vote in all municipal elections if the person is a citizen of the United States and has resided in both the state and the municipal election precinct for thirty-two days immediately preceding the election.[9]

In a densely populated and highly urbanized municipality such as Aurora, which is within the Denver metropolitan area, streets often extend into other cities or unincorporated areas of a county. The mere listing of a street name as an address may provide no indication whatsoever of the signer's eligibility to vote by reason of residing within the municipality. Moreover, referendum petitions often involve thousands of signatures, and the city clerk should not be put to the task of making an independent examination of voter registration records in order to confirm the voting eligibility of each and every petition signer who failed to include a house number as part of a street address. Requiring a petition signer to include the house number as part of the street address permits the city clerk to immediately determine whether the signer satisfies the residency requirement for voting. In addition, the inclusion of the house number as part of a street address, or an apartment number in the case of an apartment resident, serves the purpose of preventing mistake, fraud, and other abuses by enabling "one desiring to question the sufficiency of the petition to readily

---

8. The requirement of section 14–12(b) of the Aurora City Code with respect to the printing of the signer's name after the signature is identical to the statutory requirement for a referendum petition on a matter of state law. § 1–40–106(2), 1B C.R.S. (1989 Supp.).

9. Section 31–10–201(1)(b), 12B C.R.S. (1986), states that "[a]n otherwise qualified and reg-

istered elector who moves from the municipal election precinct where registered to another precinct within the same municipality within thirty-two days prior to any regular or special election shall be permitted to cast his ballot for such election at the polling place in the precinct where registered."

ascertain whether the signer actually lives at the address given." *Case v. Morrison,* 118 Colo. 517, 523, 197 P.2d 621, 624 (1948). We thus conclude that the district court erred in invalidating the "house number and/or apartment number" requirement of section 14–12(b).

### C.

■ We turn to that aspect of the district court's ruling which invalidated that part of section 14–12(b) requiring a petition signer to designate the city and county of residence after the signature. We do not view this requirement as an unconstitutional infringement upon the right of referendum.

The inclusion of the city of residence constitutes a representation that the petition signer resides within the city and thus satisfies the municipal residency qualification for voting. *See* § 31–10–201(1), 12B C.R.S. (1986). Requiring a petition signer to list the county of residence also serves an important function. The Colorado Municipal Election Code states that no person, except where a statute specifically provides otherwise, shall be permitted to vote at any municipal election without first having registered with the county clerk and recorder for the county in which the municipality is located, § 31–10–203(1), 12B C.R.S. (1986); that a city clerk shall serve as a deputy county clerk "for purposes of registration only in the county in which the municipality is located," § 31–10–204, 12B C.R.S. (1989 Supp.); that registration with the county clerk and recorder shall constitute registration for municipal elections, § 31–10–203(2), 12B C.R.S. (1986); that the city clerk shall deliver a new voter registration list to the office of the county clerk and recorder before the fifteenth day of each month and on the day following the last day for registration preceding any election for which registration is required, § 31–10–204, 12B C.R.S. (1989 Supp.); and that the county clerk and recorder shall deliver to the city

clerk a complete voter registration list or voter registration book to the city clerk on or before the fifth day preceding a municipal election, § 31–10–205, 12B C.R.S. (1989 Supp.). Since the City of Aurora is located in both Adams County and Arapahoe County, the inclusion of the county of residence on the petition permits the city clerk or anyone interested in protesting the petition to check the signature and address on the petition against the voter registration records on file with the county clerk and recorder for the particular county designated by the petition signer. The "city and county" requirement invalidated by the district court, in our view, is a valid exercise of the city's constitutional responsibility to guard against mistake, fraud, and other abuses in the referendum process.[10]

### IV.

We next consider the district court's invalidation of three subparts of section 14–13(a) of the Aurora City Code, which require the city clerk to initially find a signature insufficient for the following reasons: subpart 14–13(a)(4)—"[a]n incomplete address being given by an individual (i.e., omitted designation of street, avenue, drive, court, place, way, east, west, etc.)"; subpart 14–13(a)(5)—"[o]mission of information as to city or county"; and subpart 14–13(a)(7)—"[t]he use of ditto marks as a substitute for any required information." Since we have already determined that the city could legitimately require petition signers to designate their city and county of residence, *see* part III(C), we have no hesitation in concluding that section 14–13(a)(5), which merely repeats this same requirement, is a legitimate effectuation of the city's constitutional responsibility in providing for the exercise of the referendum power as to municipal legislation. Our focus here is on subparts 14–13(a)(4) and 14–13(a)(7).

---

**10.** The "city and county" requirement of section 14–12(b) of the Aurora City Code mirrors section 1–40–106(2), 1B C.R.S. (1989 Supp.), which requires any qualified elector signing a refer-

endum petition on a matter of state law to print the address at which he or she resides, including the city and county.

## A.

We first examine subpart 14–13(a)(4), which requires the city clerk to initially find insufficient those signatures in which the signer lists an incomplete address by omitting from the address such designations as north, south, east, or west, and also such other designations as street, avenue, drive, court, place, or way. This provision is a recognition of the fact that in Aurora, as in other densely populated cities located in a metropolitan area, public thoroughfares may span city and county boundaries such that different locations designated by the same proper name (such as "Elm") can be differentiated only by reason of some prefix (such as north or east) or suffix (such as street, avenue, drive, etc.) added to the proper name of the thoroughfare. In some cases, therefore, the determination of whether an individual's address is located within a particular municipality can be resolved only on the basis of these prefixes or suffixes supplementing the proper name in the address.

We acknowledge that there may be circumstances in which a wooden application of section 14–13(a)(5) might unduly impair an individual's right of referendum. For example, if a petition signer resides within a municipality at "955 Elm Street" and designates his address on the petition as "955 Elm," and Elm Street is the only public way within the municipality with the designation of "Elm," then it would appear that the designation of "955 Elm," although technically not in total compliance with the letter of the Aurora ordinances, would nonetheless provide the city clerk and any other interested person with sufficient information to determine whether the designated address is within the city and also to determine whether the signer actu-ally lives at that address. Due deference to the constitutional right of referendum might well prohibit the city clerk from invalidating a signature solely on the basis of an incomplete address when, as in the above described example or in similar situations, the petition signer has listed particularized information with respect to address which, although not in literal compliance with the ordinance, establishes on its face the petition signer's eligibility to vote by reason of residence at a specific location within the city.[11]

The record before us, however, does not indicate that any of the stricken entries duplicated or closely resembled the above example. We deal in this opinion only with the facial constitutionality of section 14–13(a)(5) and not with its application to fact-specific situations. While we must view this ordinance with careful scrutiny, we are satisfied that it does not amount to a facially unconstitutional abridgement of the right of referendum. Upon remand of this case, however, the parties should be accorded the opportunity to develop, if they so choose, an adequate record on the application of section 14–13(b)(5) to particular entries on the referendum petition.

## B.

We next examine subpart 14–13(a)(7), which requires the city clerk to initially find the signature of a petition signer insufficient because of "[t]he use of ditto marks as a substitute for any required information." As we have already emphasized, the primary justification for requiring a petition signer to provide information with respect to identity and residence is to safeguard the integrity of the referendum process by allowing the city

---

11. Section 14–13(b) of the Aurora City Code states as follows:

Any petition section which has attached thereto an affidavit of some qualified registered elector that each signature thereon is the signature of the person whose name it purports to be and that to the best of the knowledge and belief of the affiant each of the persons signing such petition section was at the time of signing a qualified registered elector, shall be *prima facie* evidence that the signatures thereon are genuine and true and that the persons signing the same are qualified registered electors.

If in the above example the requisite affidavit were to be attached to the petition section in which the signature appears, then an even stronger case for approving the signature would be present, since the affidavit would constitute *prima facie* evidence of the genuineness of the signature and the voting qualifications of the signer.

clerk to initially determine whether a particular petition signer is a qualified registered elector and to permit anyone interested in protesting the petition likewise to confirm or disprove the voting eligibility of the petition signer. The use of ditto marks represents a petition signer's attempt to incorporate information on a petition furnished by some other petition signer. The information sought to be incorporated may be correct, partially correct, or totally incorrect. The requirement that each petition signer furnish the requisite information after his or her signature provides a substantial degree of assurance that the necessary information with respect to voting eligibility will come from the best source—the person who signs his or her name to the petition—and not from some secondary source. Furthermore, the additional requirement that each petition signer designate the date of signing the petition provides confirmation of the fact that the petition was signed on the date explicitly designated by the signer rather than on a date designated by some other signer. We thus view the proscription against ditto marks as a valid exercise of the city's constitutional authority to provide for the manner of exercising the referendum power as to municipal legislation.

### V.

In summary, we hold that sections 14–12(b) and 14–13(a) of the Aurora City Code are not facially unconstitutional as violative of the right of referendum guaranteed by article V of the Colorado Constitution. The judgment of the district court declaring these ordinances facially unconstitutional, and also requiring the city clerk to recertify the referendum petition without regard to those parts of section 14–12(b) and 14–13(a) declared unconstitutional, is accordingly reversed, and the case is remanded to that court for further proceedings consistent with the views herein expressed.

LOHR, J., concurs in part and dissents in part.

KIRSHBAUM, J., joins in the concurrence and dissent.

Justice LOHR concurring in part and dissenting in part:

I concur with the court that the power of referendum reserved to the people by Article V, Section 1, of the Colorado Constitution is not facially infringed by those portions of the Aurora City Code that require referendum petition signers to print their names, *Aurora City Code* § 14–12(B) (1979), to provide their house and/or apartment numbers, *id.*, to provide their complete addresses, §§ 14–12(B), –13(A)(4), and to indicate their cities and counties of residence, §§ 14–12(B), –13(A)(5). However, I respectfully dissent from the court's holding that section 14–13(A)(7), which prohibits the use of ditto marks, does not facially encroach upon the power of referendum reserved to the people by our state constitution.

### I.

As the majority acknowledges, the right to referendum is fundamental. Maj. op. at 777. Article V, Section 1, of the Colorado Constitution, which reserves the power of referendum to the people, and the statutes that implement it "must be liberally construed so as not to unduly limit or curtail the exercise of the initiative and referendum rights." *Billings v. Buchanan,* 192 Colo. 32, 35, 555 P.2d 176, 178 (1976). Although municipalities may enact procedures designed to eliminate mistake, fraud and other abuses in the referendum process, maj. op. at 778, they may not establish requirements that, singly or in combination, unnecessarily restrict the right to referendum. *See Urevich v. Woodard,* 667 P.2d 760, 762 (Colo.1983) (invalidating legislative limitations on right of initiative); *Colorado Project–Common Cause v. Anderson,* 178 Colo. 1, 5, 495 P.2d 220, 222 (1972) (same); *Yenter v. Baker,* 126 Colo. 232, 237, 248 P.2d 311, 314 (1952) (same). The referendum right may not be "hampered by either technical statutory provisions or technical construction thereof, further than is necessary to fairly guard against fraud and mistake." *Brownlow v. Wunsch,* 103 Colo. 120, 123, 83 P.2d 775,

777 (1938) (quoting *State ex rel. Case v. Superior Court,* 81 Wash. 623, 632, 143 P. 461, 464 (1914)).

## II.

I agree with the majority that the requirement that signers' addresses include designations such as north, south, east or west, as well as street, avenue, drive or way may often be necessary, but that "wooden application [of this requirement] might unduly impair an individual's right of referendum." Maj. op. at 781. I would also hold that wooden application of the requirement in section 14–12(B) of the Aurora City Code that the signer's name be printed after his or her signature might likewise impair the right to referendum. Although signatures may often be illegible, the requirement that a printed name follow the signature hampers, rather than facilitates, the referendum process when a signature is legible. Likewise, the requirements that a signature be accompanied by the signer's house and/or apartment number, § 14–12(B), and the signer's city and county of residence, §§ 14–12(B), –13(A)(5), might impair the right to referendum if applied woodenly. Although an indication of the county of residence may be necessary in some instances, in others the county may be readily apparent from the other information provided. Similarly, it is conceivable that in some situations an elector's residence qualification could be easily determined without the elector's house or apartment number. Because the majority opinion addresses only the facial constitutionality of Aurora's City Code provisions, I do not read it to preclude later challenges of these requirements as they are applied in specific situations.

## III.

Finally, I would hold unconstitutional section 14–13(A)(7), which requires the city clerk to find signatures insufficient if the signer used ditto marks as a substitute for any required information. The majority states that "the primary justification for requiring a petition signer to provide information with respect to identity and residence is to safeguard the integrity of the referendum process by allowing the city clerk to initially determine whether a particular petition signer is a qualified registered elector and to permit anyone interested in protesting the petition likewise to confirm or disprove the voting eligibility of a petition signer." Maj. op. at 782. The prohibition of the use of ditto marks is not justified on this ground. Ditto marks are used to incorporate information supplied by the previous petition signer. The majority contends that the incorporated information may be partially or totally incorrect. *Id.* However, the use of ditto marks does not increase the always-present risk that a signer will include inaccurate information on a petition. The majority asserts that requiring a signer to write out the information assures that the information comes from the signer, the best source available, but that the use of ditto marks results in a reliance on a secondary source for the information. This analysis fails to take into account the fact that by putting ditto marks on a petition, the signer asserts that the information incorporated from the previous line is correct as applied to the signer. The ditto marks represent a kind of short-hand that is, nonetheless, first-person, primary-source information. Because prohibiting the use of ditto marks serves no purpose sufficiently important to justify the resulting frustration of the right to referendum, I would hold section 14–13(A)(7) unconstitutional on its face.

KIRSHBAUM, J., joins in this concurrence and dissent.