The **BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF BOULDER,** a body politic and corporate, Plaintiff–Appellee,

v.

**DOUGHERTY, DAWKINS, STRAND & BIGELOW INCORPORATED,** a Minnesota corporation, Defendant–Appellant.

No. 94CA0132.

Colorado Court of Appeals, Div. II.

Nov. 3, 1994.

As Modified on Denial of Rehearing Dec. 1, 1994.

Kutak Rock, Cassandra G. Sasso, Michael R. Johnson, Craig N. Johnson, Denver, H. Lawrence Hoyt, Boulder County Atty., Madeline Mason, Deputy County Atty., Boulder, for plaintiff-appellee.

Grimshaw & Harring, P.C., Richard L. Harring, Blake T. Jordan, Peter J. Whitmore, Denver, for defendant-appellant.

Opinion by Judge ROY.

Plaintiff, the Board of County Commissioners of the County of Boulder, Colorado (County) commenced these proceedings against defendant, Dougherty, Dawkins, Strand & Bigelow Incorporated (Dougherty), a Minnesota investment banking firm, seeking a judgment declaring the rights of the parties with respect to an equipment lease-purchase agreement and related instruments (Agreement).

Dougherty appeals from a summary judgment entered by the district court which held that the Agreement does not violate Article X, Section 20 of the Colorado Constitution entitled "The Taxpayer's Bill of Rights" (TABOR), and granting the County specific performance of the Agreement, a remedy agreed to by the parties. We affirm.

The sole issue on appeal is whether the Agreement creates a "multiple-fiscal year direct or indirect district debt or other financial obligation whatsoever" as that phrase is used in TABOR. If it does so, then, under TABOR, it is void because no election authorizing it was conducted. See Colo.Const. art. X, § 20(4)(b).

In 1993, the County, without an election, entered into an equipment lease-purchase agreement with a bank pursuant to which the bank agreed to purchase a road grader and lease it to the County for an initial term of approximately eight months with four additional one-year renewal terms. At the conclusion of the final renewal term, the County had the option to purchase the grader at no additional cost.

The bank then assigned its rights as lessor to another bank as trustee subject to a trust indenture. The trust indenture called for the trustee to issue certificates of participation representing proportionate interests in the right of the trustee to receive lease revenue from the County.

Dougherty entered into an agreement to purchase all of the certificates of participation provided it was satisfied that the arrangement did not violate TABOR. Dougherty, however, subsequently refused to purchase the certificates of participation because it was not satisfied and so notified the County.

The County contends that no multiple-year debt or financial obligation was created by the Agreement because the County was free to terminate the Agreement, without penalty, by failing to appropriate funds to pay the rent as to each lease year. The lease agreement and the trust indenture contain language to that effect. *See* Appendix. The certificates of participation similarly provide, stating in pertinent part, as follows:

THIS CERTIFICATE IS NOT AN OBLIGATION OF THE COUNTY, AND THE COUNTY IS NOT OBLIGATED BY THE LEASE TO MAKE ANY PAYMENTS IN ANY FISCAL YEAR BEYOND THE FISCAL YEAR FOR WHICH FUNDS ARE APPROPRIATED FOR THE PAYMENT THEREOF OR TO MAKE PAYMENTS FROM ANY FUNDS OF THE COUNTY OTHER THAN FUNDS APPROPRIATED FOR THE PAYMENT OF CURRENT EXPENDITURES.... ALL PAYMENT OBLIGATIONS OF THE COUNTY UNDER THE LEASE, INCLUDING, WITHOUT LIMITATION, THE COUNTY'S OBLIGATION TO PAY BASE RENTALS, ARE FROM YEAR TO YEAR ONLY AND DO NOT CONSTITUTE A MULTIPLE–FISCAL YEAR DIRECT OR INDIRECT DEBT OR OTHER FINANCIAL OBLIGATION OF THE COUNTY. THE LEASE IS SUBJECT TO ANNUAL [RENEWAL] [CANCELLATION] AT THE OPTION OF THE COUNTY AND WILL BE TERMINATED UPON THE OCCURRENCE OF AN EVENT OF NONAPPROPRIA-TION. IN SUCH EVENT, ALL PAYMENTS FROM THE COUNTY UNDER THE LEASE WILL TERMINATE, AND THIS CERTIFICATE WILL BE PAYABLE FROM SUCH MONEYS, IF ANY, AS MAY BE HELD BY THE TRUSTEE UNDER THE INDENTURE AND ANY MONEYS MADE AVAILABLE FROM LIQUIDATION OF THE EQUIPMENT. UPON THE OCCURRENCE OF AN EVENT OF NONAPPROPRIATION OR AN EVENT OF DEFAULT UNDER THE LEASE, THERE IS NO ASSURANCE OF ANY PAYMENT OF THIS CERTIFICATE.

Dougherty, on the other hand, contends that the Agreement is void absent an election approving it because: (1) TABOR is worded as broadly as possible to include all multiple-fiscal year financial obligations; (2) the Agreement is a multiple-fiscal year financial obligation; (3) TABOR supersedes prior case law to the contrary; (4) TABOR should be given the interpretation that most restrains growth in government; and (5) the promoters of TABOR intended it to apply to lease-purchase transactions.

I.

■ Unlike the federal constitution which grants powers, state constitutions, including Colorado's, are documents of limitation. *See Bickel v. City of Boulder*, 885 P.2d 215 (Colo. 1994) (rehearing denied October 11, 1994); *Prudential Insurance Co. v. Hummer*, 36 Colo. 208, 84 P. 61 (1906).

At the time the Colorado Constitutional Convention convened in 1875, public indebtedness was one of the critical issues to be addressed. In the mid-to-late 1800's many state and local governments had issued bonds to help finance the construction of railroads and, prior to the Constitutional Convention, several states had defaulted on bonds issued for that, or a similar, purpose. *See* A. Heins, *Constitutional Restrictions Against State Debt* 7–8 (1963); W. Mitchell, *The Effectiveness of Debt Limits on State and Local Government Borrowing* 12–13, Bulletin No. 45, New York University—Graduate School of Business Administration (1967). By 1875, most of the populous coun-

ties in Colorado were heavily in debt having borrowed funds to acquire securities issued by railroads. *See* D. Hensel, *A History of the Colorado Constitution in the Nineteenth Century* 155–165 (unpublished thesis in Norlin Library, University of Colorado—Boulder) (1957).

The Constitutional Convention appointed a Committee on State, County and Municipal Indebtedness which was primarily responsible for drafting what became Article XI of the Constitution. *See Proceedings of the Constitutional Convention* 37 (1907). In its first report to the convention on January 25, 1876, the Committee submitted a proposal for county indebtedness which severely limited the purposes for which debt could be incurred; limited the amount of debt that could be incurred in any one year together with the total aggregate debt which could be outstanding at any one time based on assessed valuations; specified some terms, most particularly the minimum and maximum time debt could be outstanding; and required a two-thirds vote of the qualified electors voting. *See* Appendix. This initial effort was draconian by almost any standard, but typical for the time. *See* A. Heins, *supra*, at 7–9.

After several drafts, considerable discussion, and numerous amendments from the floor, the Constitutional Convention gave final approval to what became Article XI of the Colorado Constitution. *See* D. Hensel, *supra*, at 563, 661, 707–08.

Article XI, Section 6, as adopted, incorporated a broad description of what it prohibited, limited the purposes for which indebtedness could be incurred, continued to impose an absolute limit on outstanding indebtedness as measured by assessed valuations but classified the counties, and required a majority vote of the taxpayers. *See Proceedings of the Constitutional Convention* 692 (1907). At the same time, the Constitutional Convention adopted similar restraints on indebtedness applicable to the state, Article XI, Sections 3–5; school districts, Article XI, Section 7; and municipalities, Article XI, Section 8. *See Proceedings of the Constitutional Convention* 691–93 (1907).

Subsequently, in 1969, effective January 1, 1972, Article XI, Section 6 was repealed and reenacted and now provides, in pertinent part:

(1) No political subdivision of the state shall contract any general obligation debt by loan in any form, whether individually or by contract pursuant to article XIV, section 18(2)(a) of this constitution except by adoption of a legislative measure which shall be irrepealable until the indebtedness therein provided for shall have been fully paid or discharged, specifying the purposes to which the funds to be raised shall be applied and providing for the levy of a tax which together with such other revenue, assets, or funds as may be pledged shall be sufficient to pay the interest and principal of such debt. Except as may be otherwise provided by the charter of a home rule city and county, city, or town for debt incurred by such city and county, city, or town, no such debt shall be created unless the question of incurring the same be submitted to and approved by a majority of the qualified taxpaying electors voting thereon, as the term 'qualified taxpaying elector' shall be defined by statute....

■ This provision applies to all political subdivisions of the state, uses the word "debt" in an expansive sense, no longer limits the purposes for which debt can be incurred, no longer contains limits on the amount of debt which can be outstanding at any one time, and requires an election unless the governing charter makes other provisions. This limitation on debt is considerably more liberal than the original in most respects. Article XI, Sections 8 and 9 were repealed in 1969, effective January 1, 1972, and Article XI, Section 7 was repealed and reenacted and its current provisions are not of interest here.

All of the indebtedness limitation provisions have been the subject of litigation. An issue frequently litigated is the definition of "debt" within the meaning of these provisions and, more particularly, the applicability of the phrases "any debt by loan in any form," and "any general obligation debt by loan in any form." *See* Colo. Const. art. XI, §§ 3, 6.

Early litigation dealt with the issue of whether revenue bonds constituted debt within the meaning of the debt limitations. Typical of this litigation was our supreme court's opinion in *Shields v. City of Loveland*, 74 Colo. 27, 218 P. 913 (1923).

In *Shields*, the city sought to construct an electrical generation facility and issued $300,000 in revenue bonds and pledged the revenue from the generation facility to pay the bonds and covenanted to purchase $5,000 of electricity annually for street lighting. The project was challenged on the grounds, among others, that the revenue bonds exceeded the city's debt limit and the obligation to purchase electricity in the future was a "debt" in the constitutional sense. Our supreme court held that neither the revenue bonds nor the obligation to purchase electricity in future years constituted a "debt," stating:

> Plaintiffs in error insist, however, that the revenue bonds constitute a debt, and so the lawful limit is exceeded. We do not think that they amount to a debt within the intent of the Constitution or statute. The definitions of the word 'debt' are many, and depend on the context and the general subject with reference to which it is used.... *Its meaning in the sections of the Constitution and statutes now before us must be determined by their purpose, which was to prevent the overburdening of the public and bankruptcy of the municipality. Clearly the revenue bonds are not within that purpose. The public can never be overburdened by that which it is under no obligation to discharge, nor can the city become bankrupt by what it does not have to pay. Nor are these bonds a technical debt. Nothing is my debt unless a judgment for its amount can be recovered against me upon it....*
>
> Is the agreement to pay into the fund $5,000 per annum for street lights a debt? We think it is not.
>
> . . . .
>
> Fundamentally this is a method of paying annually for street lighting annually furnished, and it has been held that such contracts do not create debts within the meaning of laws like those now in question. *Leadville Gas Co. v. Leadville*, 9 Colo.App. 400, 49 Pac. 268 [ (1897) ]; *Denver v. Hubbard*, 17 Colo.App. 346, 68 Pac. 993 [ (1902) ]; ... *The reasoning of these cases is that such a contract creates no debt till the goods are delivered or services rendered, and it would seem to follow that all the payments under such a contract would no more constitute an indebtedness than one of them.*

*Shields v. City of Loveland, supra,* 218 P. at 915–16 (emphasis added); *see also Searle v. Town of Haxtun*, 84 Colo. 494, 271 P. 629 (1928); *but see Reimer v. Town of Holyoke*, 93 Colo. 571, 27 P.2d 1032 (1933) and *City of Trinidad v. Haxby*, 136 Colo. 168, 315 P.2d 204 (1957) (pledging of future revenues from sources presently available for general purposes not constitutional).

Recent litigation has also applied the debt limitation provisions of the constitution to lease-purchase agreements. In *Gude v. City of Lakewood*, 636 P.2d 691 (Colo.1981), the city, after a bond issue was soundly defeated, entered into a lease-purchase agreement for a city hall to be built by an authority created by the city on land owned by the city. The building and the land were then leased to the city for a term of 25 years but the lease was terminable by the city at the end of any year, without penalty. This arrangement was attacked as unconstitutional under the present Article XI, Section 6 of the Colorado Constitution.

Our supreme court upheld the agreement and stated:

> Of particular importance to our conclusion that the city's rental obligations for future years do not constitute debt in contravention of Colo. Const. Art. XI, § 6 is the lease provision that those obligations are contingent upon exercise of the city's renewal options. We have held that discretionary or contingent obligations are not constitutional debt. 'To constitute a debt in the constitutional sense, one legislature, in effect, must obligate a future legislature to appropriate funds to discharge the debt created by the first legislature.'

*Gude v. City of Lakewood, supra,* at 699.

In *Glennon Heights, Inc. v. Central Bank & Trust*, 658 P.2d 872 (Colo.1983), the state

entered into a lease-purchase agreement with a bank for the construction of group homes for the developmentally disabled. This agreement was challenged as violating Article XI, Section 3 of the Colorado Constitution which forbids the state from contracting "any debt by loan in any form." Holding that no "constitutional debt" was created, the court stated:

> [W]e conclude that the lease/purchase agreement here does not violate that provision. We have stated that some of the indications of a debt in the constitutional sense are that the obligation pledges revenues of future years, that it requires use of revenue from a tax otherwise available for general purposes, that it is a legally enforceable obligation against the state in future years, or that appropriation by future legislatures of monies and the payment of the obligation is nondiscretionary.

*Glennon Heights, Inc. v. Central Bank & Trust, supra* at 878–79; *but see Black v. First Federal Savings & Loan Ass'n,* 830 P.2d 1103 (Colo.App.1992), *aff'd sub nom. La Plata Medical Center Associates, Ltd. v. United Bank,* 857 P.2d 410 (Colo.1993) (multi-year lease of real property, without purchase option and without annual renewal or cancellation, violated Colo. Const. art. XI, § 6, and was void).

The concern over public indebtedness is not new to Colorado. Limits on public indebtedness have existed in Colorado for almost 120 years, the historic purpose of which was to prevent public insolvency and increased strain on the tax base which was originally limited to property taxes. *See Shields v. City of Loveland, supra; see also,* D. Hensel, *A History of the Colorado Constitution in the Nineteenth Century, supra,* at 155–165. A considerable body of stable law and practice has developed with respect to these indebtedness provisions.

## II.

TABOR was proposed by initiative and was approved by the voters in the general election on November 3, 1992. It is a multi-faceted provision that requires voter approval for certain tax increases and the incurring of multiple fiscal year debts or financial obli-gations, limits the growth of revenues, and limits spending. *See Submission of Interrogatories on Senate Bill 93–74,* 852 P.2d 1 (Colo.1993). It is included in Article X of the Colorado Constitution which deals with revenue, not Article XI which deals with indebtedness.

■ The principal purpose of TABOR is to limit growth of government in general and the growth in public expenditures in particular. Limitation on indebtedness is not its primary purpose.

As pertinent here, TABOR provides that:

(1) General provisions.... Its preferred interpretation shall reasonably restrain most the growth of government. All provisions are self-executing and severable and supersede conflicting state constitutional, state statutory, charter, or other state or local provisions....

(4) Required Elections. Starting November 4, 1992, districts must have voter approval in advance for: ...

(b) ... creation of any multiple-fiscal year direct or indirect district debt or other financial obligation whatsoever without adequate present cash reserves pledged irrevocably and held for payments in all future fiscal years.

Colo. Const. art. X, §§ 20(1), (4)(b).

TABOR has been construed and applied in only five appellate decisions. *Bickel v. City of Boulder, supra* (construing election requirements of TABOR); *In re Proposed Tobacco Tax Amendment 1994,* 872 P.2d 689 (Colo.1994) (same); *Submission of Interrogatories on Senate Bill 93–74, supra* (concerning the relationship of Colo. Const. art. X, § 20 to Colo. Const. art. XVII with respect to lottery proceeds); *Cerveny v. City of Wheatridge,* 888 P.2d 339 (Colo.App.1994) (construing and applying attorney fees provisions of TABOR); and *Board of County Commissioners v. E–470 Public Highway Authority,* 881 P.2d 412 (Colo.App.1994) (certiorari granted October 11, 1994) (holding that the E–470 Public Highway Authority is an "enterprise" within the meaning of TABOR and therefore exempt from TABOR's election requirements). This is a case of first impression.

The most important of these cases for our purposes is *Bickel v. City of Boulder, supra.* In *Bickel,* the plaintiffs challenged a number of ballot proposals by the City of Boulder, the County of Boulder, and the Boulder Valley School District RE–2. At issue was whether various ballot proposals seeking to authorize an increase in some taxes, impose new taxes, authorize an increase in bonded indebtedness, authorize the construction of school buildings and related improvements, and grant a utility franchise met the specific requirements of TABOR with respect to the ballot titles and the consolidation of proposals. While the issues addressed in *Bickel* are somewhat different than those presented here, our supreme court established important and binding principles with respect to the construction of TABOR and the relationship of TABOR to other provisions of the constitution, especially Article XI, Section 6.

With respect to these matters, the supreme court held that: (1) TABOR does not create in the citizens of Colorado a new "fundamental right" to vote on debt and tax ballot issues; (2) TABOR does supersede other constitutional provisions which conflict with it when TABOR authorizes what another provision forbids or forbids what another authorizes; (3) when no conflict exists between TABOR and another provision of the constitution, it is presumed that TABOR was framed and adopted in the light and understanding of the previously enacted constitutional provisions; (4) the preferred interpretation of TABOR "shall reasonably restrain most the growth of government"; (5) TABOR should be construed to avoid an unjust, absurd, or unreasonable result; (6) the favored interpretation of TABOR should harmonize it with the other provisions of the constitution rather than to create conflicts between them; and (7) when TABOR uses a term it does not define, there is a presumption that its use is with reference to pre-existing law.

In addition, in *Bickel* the plaintiffs conceded, and the supreme court agreed, that TABOR did not explicitly or implicitly repeal Article XI, Section 6 of the Colorado Constitution.

## III.

■ The pivotal issue for review here is whether the Agreement creates "any multiple-fiscal year direct or indirect district debt or other financial obligation whatsoever" within the meaning of TABOR. We conclude that it does not, and affirm.

### A.

■ Dougherty first contends that TABOR supersedes prior case authority permitting lease-purchase agreements. We disagree. This contention was directly answered in *Bickel v. City of Boulder, supra,* to the contrary. We therefore analyze TABOR in light of the existing well-established constitutional law in existence at the time of the adoption of TABOR.

TABOR contains express language repealing conflicting provisions of the constitution and subordinate laws. Conflicting and earlier adopted provisions of the constitution and subordinate laws would, with limited exceptions, be repealed by implication without the express repealer contained in TABOR. *See Submission of Interrogatories on Senate Bill 93–74, supra; People ex rel. Carlson v. City Council,* 60 Colo. 370, 153 P. 690 (1915).

Under the rules of *Bickel,* a conflict arises when one provision authorizes what the other forbids or forbids what the other authorizes, and in the absence of a conflict, a court should presume that the new provision has been "framed and adopted 'in the light and understanding of prior and existing laws and with reference to them.'" *Bickel v. City of Boulder, supra,* at 229; *see also In re Interrogatories Concerning House Bill 1078,* 189 Colo. 1, 536 P.2d 308 (1975). While TABOR defines several of its terms, including the term "district," it does not define any of the other terms used in the phrase "multiple-fiscal year direct or indirect district debt or other financial obligation whatsoever...."

The meaning of the term "debt," in the constitutional sense, as we have seen, has been interpreted numerous times by our appellate courts.

The term "obligation" is defined in *Webster's Third New International Dictionary* 1556 (1986) as:

a bond with a condition annexed and a penalty for nonfulfillment; *broadly:* a formal and binding agreement or acknowledgment of a liability to pay a specified sum or do a specified thing ... a duty arising by contract: a legal liability ... a legal relationship or tie in accordance with which one party is able to compel another in a personal action and under the existing circumstances to do or not to do a specified act (as to pay money or transfer property) or to refrain from specified conduct and which arises out of a contract, quasi contract, delict, or quasi delict. (emphasis original)

Some definitions of "obligation" are a bit more expansive and include moral or ethical matters which are not applicable here in that the word "obligation" is limited in its meaning by the modifier "financial."

 We do not consider the word "whatsoever" as being equivalent to "including but not limited to." It does not expand the meaning of the phrase to terms other than "debt" or "financial obligation," but rather merely emphasizes an intent to include anything which is a "debt" or "financial obligation" regardless of form.

 The term "multiple-fiscal year," which modifies both "debt" and "financial obligation," refers to the binding of future legislative bodies to pay the "debt" or "other financial obligation" out of future revenues.

The Agreement does not create a "debt" or "other financial obligation" in any future year because it does not require funds to be appropriated for that purpose, nor does it obligate future commissioners to tax for that purpose. It is not, therefore, "multiple-fiscal year" in the constitutional sense. Indeed, the Agreement is more akin to the purchase of electricity by the City of Loveland which was characterized as creating a "debt" only when the goods or services are being, or have been, delivered. *Shields v. City of Loveland, supra.*

Here, the County need not pay for the use of the equipment until the year in which it is utilized. Thus, the Agreement may be considered as a series of one-year contracts which the County can elect, in each year, to accept or reject without penalty.

 Suffice it to say that, for our purposes, the words "debt" and "financial obligation" are synonymous, or virtually synonymous. In addition, the Agreement is not, by its terms, "multiple-fiscal year." We do not, therefore, read the phrase "multiple-fiscal year direct or indirect district debt or other financial obligation whatsoever" in TABOR as being any broader, or requiring a result different from, the phrase "debt by loan in any form" contained in Article XI, Section 6.

### B.

 Dougherty argues that the County will be compelled to continue to perform in future years because, if the arrangement is terminated, its failure to perform would injure its credit rating and cause a "loss of equity." Dougherty contends that the lack of any future obligation to pay is in the nature of "a wink and a nod," that the County has a present intent to perform the Agreement as written and ultimately to own the equipment, and that to characterize the Agreement as anything other than a multiple-fiscal year debt or other financial obligation is to exalt form over substance.

There can be very little doubt that Dougherty contemplates receiving, and the County contemplates paying, rental payments in future years. It is equally clear that Dougherty does not wish to own a road grader which is of very little use in the investment banking business. Dougherty may even consider its ultimate ownership of the road grader as the breach of an understanding. All of this is, or may be, true, but it is equally true that Dougherty is amply advised in clear and unequivocal language that such an outcome is a distinct possibility, and it has surrendered all of the remedies it might otherwise have against the County which could in any way compel the County to perform in future fiscal years or respond in damages.

Dougherty's arguments in this regard are not new and were addressed and disposed of

in *Glennon Heights, Inc. v. Central Bank & Trust, supra,* at 879, wherein the supreme court stated:

> Under the present lease/purchase agreement, the bank has no legally enforceable right to require the general assembly to appropriate sufficient funds for renewal of the lease term every year or to require the state to exercise its option to purchase. The agreement provides that the Department of Institutions will use its 'best efforts' to obtain funding every year for the rent payments, but that the appropriation of funds is a legislative act beyond the control of the department. Renewal of each lease term is specifically tied to appropriation of sufficient funds, and the lease terminates with no further obligation of the department if funds are not available. Nothing in the agreement limits the discretion of the legislature. *The plaintiffs' arguments that nonrenewal of the lease will ruin the credit of the state and will result in forced relocation of the disabled residents are matters that may affect the legislature's exercise of its discretion, but do not commit revenues available to future legislatures to the payment of rentals under the lease.* (emphasis added)

It is apparent that if Dougherty does not wish to own a road grader for any extended period, it must otherwise protect itself by structuring the agreement which can be, and presumably has been, done. While provisions designed to protect Dougherty may also encourage future commissioners to renew and perform the Agreement, the Agreement does not require future performance by the County, and there is no remedy against the County or its future revenues should it fail to perform.

### C.

■ Dougherty also argues that any interest earned on the certificates of participation are being represented as tax free pursuant to the Internal Revenue Code which is true only if the Agreement constitutes an obligation of a state or political subdivision thereof. *See* 26 U.S.C. § 103 (1988). This argument, even if correct, is of no assistance. The Internal Revenue Code

does not control the interpretation of the Constitution of the State of Colorado. In addition, whether or not the interest income derived from the Agreement is tax free is a risk assumed by Dougherty, or any investor concerning which we express no opinion. Whether the interest on this, or any similar, transaction is tax free will affect the financial benefit contemplated by all parties, but it has no impact upon our interpretation of the Colorado Constitution.

### D.

■ Dougherty urges that TABOR is to be construed in a manner which shall reasonably "restrain most the growth of government." Colo. Const. art. X, § 20(1). We agree. *See Bickel v. City of Boulder, supra; Submission of Interrogatories on Senate Bill 93–74, supra.* That does not, however, affect our analysis here.

■ The principal thrust of TABOR is to limit the size or growth of state government by restricting total revenue, total expenditures, the creation of new taxes, and increases in tax rates. The Agreement has no effect on any of these matters. There is no pledge to commit future funds to the performance of the Agreement. There is no commitment to tax the citizens to assure the availability of funds to perform the Agreement. The contemplated future payments will, of necessity, have to be made from funds which are otherwise available for other purposes. The decision to make the payments is left to future commissioners and will, presumably, be premised in part on the availability of funds for all purposes at that time. Therefore, the Agreement has no direct impact on the size, or growth, of county government.

### E.

Contrary to the defendant's contention, and because we conclude that the plain language of TABOR is not ambiguous with respect to the issues presented here, we need not resort to extrinsic evidence to give effect

to the intent of its promoters or the voters who effectuated its adoption.

Judgment affirmed.

PLANK and HUME, JJ., concur.

### APPENDIX

The Lease Agreement provides, in pertinent part, as follows:

Section 4.1 *Commencement and Duration of Lease Term.* This Lease shall commence as of the execution and delivery hereof. The Original Term shall terminate on December 31, 1993. This Lease may be [renewed] [continued], solely at the option of the County, for four (4) Subsequent Terms. . . .

. . . .

Section 6.1. *Payments to Constitute Current Expenditures of the County.* The County and the Bank acknowledge and agree that the Base Rentals and Additional Rentals hereunder shall constitute current expenditures of the County payable in the fiscal years for which funds are appropriated for the payment thereof. The County's obligations under this Lease shall be from year to year only (as further provided in Sections 4.1, 4.2, 6.2 and 6.6 hereof) and shall not constitute a multiple-fiscal year direct or indirect debt or other financial obligation of the County or an obligation of the County payable in any fiscal year beyond the fiscal year for which funds are appropriated for the payment thereof or payable from any funds of the County other than funds appropriated for the payment of current expenditures. The County shall be under no obligation whatsoever to exercise its option to purchase the Equipment. No provision of this Lease shall be construed to pledge or to create a lien on any class or source of County moneys.

. . . .

Section 14.3 *Limitations on Remedies.* . . . The remedy described in Section 14.2(b)(ii) hereof shall not be available for an Event of Default consisting of failure by the County to surrender possession of the Equipment by the expiration of the Original Term or any Subsequent Term during which an Event of Nonappropriation occurs.

The Trust Indenture provides, in pertinent part, as follows:

Section 2.03. *Limited Obligations.* Each Certificate shall evidence assignment of a proportionate interest in the rights of the Trustee as assignee of the Bank hereunder to receive Revenues under the Lease. The Certificates are payable solely from Revenues as, when and if the same are received by the Trustee, which Revenues are to be held in trust by the Trustee for such purposes in the manner and to the extent provided herein. The Certificates are not obligations of the County, and the issuance of the Certificates shall not directly or indirectly obligate the County to make any payments other than those required under the Lease.

. . . .

Section 3.01. *Source of Payment of Certificates.* . . . The Certificates evidence assignments of proportionate interests in the rights of the Trustee, as assignee of the Bank hereunder, to receive Revenues under the Lease. The Certificates shall be payable solely from Revenues received by the Trustee and do not constitute an obligation of the County. Revenues, when, as, and if received by the Trustee, shall be held hereunder for payment of the principal of, premium, if any, and interest on the Certificates as provided in this Indenture.

. . . .

Section 7.02. *Remedies on Default.*

. . . .

No right or remedy is intended to be exclusive of any other right or remedy, but each and every such right or remedy shall be cumulative and in addition to any other remedy given hereunder or now or hereafter existing at law or in equity or by statute. However, notwithstanding any other provision of the Lease or this Inden-

ture, any and all remedies against the County under the Lease or this Indenture shall be limited as provided in Section 14.3 of the Lease.

Exhibit B of the Trust Indenture provides, in pertinent part, as follows:

The Lease is subject to annual [renewal] [cancellation] at the option of the County. The obligation of the County to pay Base Rentals and Additional Rentals under the Lease terminates in the event that the County, for any reason, fails to appropriate moneys to pay all Base Rentals and reasonably estimated Additional Rentals during the next ensuing year of the Lease.

Article XI, Section 6, as originally proposed to the Constitutional Convention, provided as follows:

Sec. 6. No county or township shall contract any debt by bond or other evidence of indebtedness, except for the purpose of erecting necessary public buildings, or for the making or repairing of public roads or bridges, and such indebtedness contracted in any one year shall not exceed an amount equal to two mills on each dollar of valuation of property subject to taxation by such county or township, as the case may be, and the aggregate amount of such debt, inclusive of all unfunded or floating indebtedness of such county or township hereafter created and existing at the time of the creation of such debt, shall not exceed an amount equal to four mills on each dollar of said last mentioned valuation, unless, when in manner provided by law, fixing the rate of interest thereon, and providing for the levying of a tax not exceeding the rate of three mills on each dollar of valuation last mentioned, sufficient to pay the annual interest on and extinguish the principal of such debt within fifteen, and not less than ten, years from the creation thereof, the question of waiving such debt shall be submitted to the qualified electors of such county or township, and two-thirds of those voting thereon shall vote in favor of incurring such debt.