I. QUESTIONS PRESENTED AND CONCLUSIONS
Question 1: Absent advance voter approval, can the Colorado Department of Personnel (the "Department") constitutionally enter into a $50 million lease-purchase agreement, using certificates of participation, to finance the acquisition of motor vehicles?
Answer 1: Yes. The transaction is a commercially reasonable acquisition of tangible property in the ordinary course of the agency's business.
Question 2: Must the Colorado Department of Personnel act under the Master Leasing Act, §§ 24-82-701 to 24-82-709, C.R.S. (2001), for its lease-purchase of motor vehicles?
Answer 2: No. The Master Leasing Act is not the exclusive authority for the proposed transaction.
Question 3: Must the Department's budget request for lease-purchase appropriations under § 24-82-801, C.R.S. (2001) specifically request permission to use certificates of participation?
Answer 3: Yes.
 II. ANALYSIS
A. INTRODUCTION
The Department operates the State's motor vehicle fleet. A specific statute, § 24-30-1117, C.R.S. (2001), grants to the Department "exclusive authority to purchase, lease, and otherwise acquire motor vehicles for such use by state officers and employees as may be necessitated in the course and conduct of official state business."
The Department currently uses a lease-purchase agreement to finance vehicles. The Department estimates that it can save approximately $1.7 million dollars over the next five years by financing the acquisition of motor vehicles through the use of a lease-purchase involving certificates of participation ("COP").
This opinion first considers whether citizens of Colorado must pre-approve a COP lease-purchase transaction by vote. This legal issue arises because Article X, § 20(4)(b) of the Colorado Constitution — a part of the Taxpayer Bill of Rights, or "TABOR" — prohibits certain types of contractual obligations spanning multiple fiscal years absent advance voter approval.
Several state statutes preclude lease-purchase agreements involving COPs unless the appellate courts rule they are legal without advance voter approval, and this opinion considers the effect of these statutes. Finally, this opinion addresses the legal requirements of the Master Leasing Act, found at §§24-82-701 to 24-82-709, C.R.S. (2001), and whether the Department's budget must include a specific request for COP authority.
B. BACKGROUND
This section explains how traditional lease-purchase agreements work, and how they differ from lease-purchase transactions involving COPs. It also describes the COP transaction contemplated by the Department.
1. Lease-Purchases and Certificates of Participation
In a lease-purchase transaction that does not involve COPs, the lessee typically pays fair market rent for the use of property until the financing is paid in full. The lessor retains legal ownership of the property until final payment. Generally, the lessee may buy the property at any time by paying the balance of all rent due for the remaining lease term plus a nominal amount. Each payment by the lessee contains an interest component.
Governments use lease-purchases to annually pay for assets as they are used rather than paying the entire purchase price up front. An advantage also accrues because interest income received by the lessor or its creditors is typically exempt from federal and state income tax in a government transaction. 26 U.S.C. § 103 (2001). See also § 39-22-112(1), C.R.S. (2001). This tax benefit encourages investment in public financing at reduced rates of interest, which in turn lowers the total financed cost to the taxpayers to acquire the asset.
Transactions involving COPs provide a means of spreading among multiple parties the risk of the transaction.[1] The lessor assigns its rights to a trustee, which in turn sells certificates of participation evidencing the right to receive rental payments. The rights of "participants" who buy the COPs are similar to those of the lessor in a more traditional lease-purchase.
In either case described, the right to receive rental payments is conditioned on the government's right to end the transaction each year by not appropriating money to lease the property. Recourse against the government is limited to enforcement of the security interest in the tangible property purchased by the lessor. In the case examined here, the State would surrender possession of its rented motor vehicles.
2. Department of Personnel Lease-Purchase of Fleet Motor Vehicles
The Department is exclusively authorized to obtain motor vehicles for State business under § 24-30-1117. Other state agencies and institutions lease vehicles from the Department. They pay user fees to the Department from their operating budgets. Section24-30-1104(2)(e) and (2)(k), C.R.S. (2001).
The Department currently uses a traditional lease-purchase agreement for its fleet. The amount of the agreement is approximately $37 million. Pursuant to § 24-30-202(5.5), C.R.S. (2001), the State Controller approved the lease-purchase contract as to TABOR issues, with legal advice from the Attorney General's office. See § 24-30-202(1), C.R.S. (2001) (controller approves contracts involving disbursement of money). See also §24-30-202(10), C.R.S. (2001) (Attorney General advises Controller).
The Department is considering a new lease-purchase of motor vehicles involving the issuance of approximately $50 million in COPs.[2] The proceeds from the sale of COPs will be held in trust. The proceeds will be used to refinance the existing lease-purchase of approximately $37 million and to acquire approximately $8 to $12 million in new vehicles, in accord with the State's standard annual vehicle replacement cycle. After paying the costs of the project, any balance of proceeds will continue to be held in trust by a private bank acting as trustee.
The proceeds from COPs will be collected and substantially expended during the same fiscal year. Refinancing of the existing lease-purchase will occur almost immediately, and new vehicles ordered in December 2001 will be paid for upon delivery, with invoicing expected between January and the end of June 2002. Various contingencies could delay some portion of the expenditures into the next ensuing fiscal year. For example, a manufacturer may be late delivering custom-made vehicles.
A lease-purchase agreement will be structured with a private entity acting as lessor.[3] The agreement will be renewable annually at the State's option, and will have a finite duration. The lessor will hold legal title to all of the vehicles. As with any lease-purchase agreement, the State has the use of the vehicles so long as it pays rent, but does not ultimately acquire title to the vehicles if all lease payments are not made.
The lessor will assign its interest in the lease-purchase agreement to the trustee under a trust indenture, except for certain rights to be reimbursed for the lessor's own costs, fees and expenses. The State will pay rent to the trustee. The indenture will create a security interest in favor of the trustee in the vehicles owned by the lessor. If the General Assembly does not appropriate rent in any year, the trustee, on behalf of the participants, may foreclose on the vehicles owned by the lessor. No security interest is created in any property owned by the State.
A bond insurance policy will be purchased to protect the participants. This policy "pays for itself," because it increases the creditworthiness of the COPs from AA to AAA. This lowers the interest rate on the COPs, which, in turn, reduces the amount of the lease payments and further lessens the financial burden on the taxpayers. In the event of non-payment by the State, the bond insurer is subrogated to the rights of the trustee against the State and the lessor. Remedies against the State are not altered by the bond insurance.
The purchasers of COPs will own the proceeds held in trust by the trustee. That portion of the proceeds allocated to paying for the vehicles ("project fund") is subject to the equitable interest of the State to have the money used to obtain motor vehicles it desires to lease.
COPs will be executed and sold by the trustee. COPs are "negotiable instruments" within the meaning of the Colorado Uniform Commercial Code. Section 4-3-104, C.R.S. (2001). They are also "securities" as defined by the Colorado Securities Act. See §11-51-201(17), C.R.S. (2001).
C. CONSTITUTIONAL RESTRICTIONS ON MULTI-YEAR CONTRACTS
This section discusses three restrictions on State government financial obligations that span more than one fiscal year, including the Department's proposed COP transaction. These restrictions are imposed by the Colorado Constitution. The first precludes the State from pledging its credit to secure the debt of a non-state entity. The second restricts debt contracted directly by the State. The third requires advance voter approval of certain types of multiple fiscal year financial obligations.
1. Prohibited Debt
State and local governments may not promise payment of public funds for more than one fiscal year at a time, because debt over multiple years is generally prohibited by Article XI of the Colorado Constitution. The framers of the Colorado Constitution adopted Article XI to allay concerns about placing taxpayer resources at risk in order to finance speculative railroad ventures. Board of County Comm'r. of County of Boulder v.Dougherty, Dawkins, Strand Bigelow Inc., 890 P.2d 199, 202-03
(Colo.App. 1994).
Article XI, § 1, of the Colorado Constitution precludes the State from indirectly incurring debt by pledging its credit to secure non-state obligations. Article XI, § 3, generally prohibits the State from directly incurring debt by loan in any form. These limitations exist to keep state financing substantially on a cash basis from year to year, and to preserve the right of the people to elect future legislatures free to appropriate money without the burden of financial obligations of their predecessors. In reSenate Resolution No. 2, 94 Colo. 101, 119, 31 P.2d 325, 332
(1933).
Contracts that span more than one fiscal year do not constitute prohibited debt if the government has the express, annual right to not appropriate money, and to end the transaction in any given year. Glennon Heights, Inc. v. Central Bank Trust, 658 P.2d 872,878-79 (Colo. 1983) (state lease-purchase agreement with private bank using COPs to finance the acquisition of group homes for the developmentally disabled). See also Gude v. City of Lakewood,636 P.2d 691 (Colo. 1981) (city lease-purchase agreement using COPs to finance acquisition of municipal building). Based upon this doctrine, a lease-purchase agreement subject to annual appropriation does not create debt in violation of the Colorado Constitution.
2. Multiple Fiscal Year Financial Obligations Under TABOR
In 1992 the citizens of Colorado amended the Colorado Constitution to restrict certain fiscal powers of state and local governments. The amendment is TABOR, and is located at Article X, Section 20 of the Colorado Constitution. Subsection (4)(b) of TABOR requires advance voter approval of certain financial obligations that span more than one State fiscal year.
Section 20(4)(b) of TABOR states:
 (4) Required elections. Starting November 4, 1992, districts must have voter approval in advance for:
* * *
 (b) Except for refinancing district bonded debt at a lower interest rate or adding new employees to existing district pension plans, creation of any multiple-fiscal year direct or indirect district debt or other financial obligation whatsoever without adequate present cash reserves pledged irrevocably and held for payments in all future fiscal years.
State government is a "district." Colo. Const., art X, § 20(2)(b). This provision therefore raises a legal question whether the Department's proposed financing of motor vehicle acquisition requires a vote of the People. More specifically, is the Department's proposal a "multiple fiscal year direct or indirect district debt or other financial obligation?"
3. Prohibited Debt and Multiple Fiscal Year Financial Obligations
Until recently, constitutionally prohibited debt was legally synonymous with TABOR's restriction on multiple fiscal year financial obligations. This changed significantly with the issuance of a 1999 Colorado Supreme Court opinion. This part describes the historic doctrine, and then describes the legal change that took place in 1999. The 1999 change provides the analysis used in the remainder of this opinion.
a. Pre-1999. Prior to 1999, the prevailing view of voter approval requirements in TABOR was expressed in the Dougherty case,890 P.2d at 206-07. This case involved a county's five million-dollar lease-purchase of road grader. It involved issuance of COPs. The court held that this transaction did not require an advance TABOR vote.
The Court of Appeals in Dougherty held that undefined terms in TABOR, such as "debt" and "financial obligation," were to be given their legal meaning under prior law. Id. at 206-07 (relying uponBickel v. City of Boulder, 885 P.2d 215 (Colo. 1984)). The Court concluded that if a lease-purchase agreement contained a non-appropriation clause sufficient to survive constitutional prohibitions on debt, it did not require advance voter approval under TABOR § 4(b).
One year prior to the Dougherty decision, the General Assembly codified the same conclusion. Ch. 328, 1993 Colo. Sess. Laws 2031. By statute, the legislature validated, without advance voter approval, multiple fiscal year contracts subject to annual non-appropriation. Section 24-30-202(5.5), C.R.S. (2001) declares:
 Any commitment voucher that provides that the financial upon funds for that purpose being appropriated, budgeted, and otherwise made available shall not be deemed to create any state multiple-fiscal year direct or indirect debt or other financial obligation whatsoever for purposes of section 20(4)(b) of article X of the state constitution.
b. After 1999. This black and white legal approach changed significantly in 1999, when the Colorado Supreme Court overruled the part of Dougherty that equates constitutionally prohibited debt and multiple fiscal year financial obligation under TABOR. The case is Submission of Interrogatories on House Bill 99-1325,979 P.2d 549, 556-59 (Colo. 1999), and in it the Colorado Supreme Court struck down a proposal to raise one billion dollars for highway construction through the issuance of transportation revenue anticipation notes ("TRANs"). In its holding that is central to this opinion, the Court decided that some government financial transactions spanning more than one fiscal year require advance voter approval even though they would not otherwise create prohibited debt.
The Interrogatories case first reaffirmed the non-appropriation doctrine of Glennon Heights and Gude with respect to prohibited debt under Article XI of the Colorado Constitution.979 P.2d at 556-57. Nevertheless, the Court next held that the TRANs transaction — as a whole — reflected the type of multiple fiscal year financial obligation the voters intended to prevent without their advance approval, even though the State was not legally obligated to make payments on the TRANs in future fiscal years.979 P.2d at 557-559.
According to the Interrogatories Court, a non-appropriation clause, conditioning a payment obligation in future years, is not sufficient standing alone to satisfy TABOR. It examined the "entire obligation . . . as a whole" and concluded that the extent of the security given by the State in the event of non-payment appeared to be a financial obligation spanning more than one year.Interrogatories, 979 P.2d at 558. Among other factors, the Court considered highly significant the sheer size of the one billion-dollar transaction, the absence of a security interest in any tangible asset, and the heavy TRANs dependence upon uncertain future federal funding.
Nevertheless, the Supreme Court in Interrogatories also affirmed the legality of the lease-purchase agreement for the road grader in Dougherty without a prior vote of the People. Id. at 557. Therefore, advance voter approval is not required in every case.
The Interrogatories opinion establishes a continuum for government financing transactions under § 20(4)(b) of TABOR. At one end lie multi-year obligations requiring advance voter approval, such as the TRANs notes. At the other end, Dougherty-type multi-year transactions remain authorized without voter approval.
c. The Interrogatories Factors. The Court examined several factors to decide where on this continuum of obligations spanning several years the TRANs obligation fell. The legality of using COPs to finance the acquisition of motor vehicles for the State's fleet without advance voter approval turns on the application of theseInterrogatories factors to the Department's plan to purchase vehicles.
According to the Interrogatories case, the following factors weigh toward a transaction that is exempt from TABOR voting requirements:
 • The transaction does not involve the issuance of negotiable instruments, such as bonds or notes by the State.
 • The government receives tangible property for use rather than money to spend.
 • The lender or investors have a security interest in tangible property, which can be repossessed in the event of non-payment.
 • The lender or investors do not have a security interest in the balance of the unspent cash proceeds of the transaction.
 • The transaction does not involve the use of credit enhancement mechanisms, such as bond insurance or letters of credit.
 • The transaction has a finite duration for repayment. There is no open-ended commitment to pay until repaid in full.
 • The sources of revenue for repayment are substantially under the State's control and the transaction is not primarily dependent over a long term upon uncertain external sources of funds, such as future appropriations by the federal government.
 • The dollar amount of the transaction is a realistically manageable obligation and does not substantially consume or exceed the agency's total annual budget.
• A private lessor owns the equipment leased to the State.
 • Incurring the cost of a holding an election would be absurd under the circumstances.
Interrogatories, 979 P.2d at 556-559. See also Colorado Municipal League, TABOR: A Guide to the Taxpayer's Bill of Rights, 51-52, (1999).
4. Application of Interrogatories Factors to the ProposedDepartment Vehicle Lease-Purchase Agreement
Determining the legality of a lease-purchase agreement involving COPs, absent advance voter approval, presents a complex balancing of competing interests. Applying the Interrogatories factors to the facts before me, I conclude the Department's vehicle acquisition program does not require advance voter approval under TABOR.
a. Negotiable Instruments. The transaction involves the issuance of negotiable instruments and regulated securities, for which the State could be considered an "issuer" under federal and state securities law. See § 11-51-201(10), C.R.S. (2001). However, securities issued by federal, state and local governments are exempt from registration under federal and state law.15 U.S.C. § 77c(a)(2) (2001); § 11-51-307(1)(a), C.R.S. (2001).
In the Department's transaction, as in most COP arrangements, the trustee bank sells the COPs directly to the public. The State is not directly selling any security and is merely the disclosed source of rental payments primarily for purposes of the exemptions from taxation and securities registration. The presence of the trustee as the seller of COPs presents important differences from a direct issuance of securities by the State.
The trustee is a sophisticated intermediary acting on behalf of the participants. The presence of a trustee provides the participants additional legal rights they would not otherwise have if the State directly issued securities. Through the trustee, the participants have contractual rights to foreclose upon meaningful security and attempt to recover their investment if the State elects to discontinue leasing the property. Thus, the State enters into a contract to lease property, one component of which is the sale of COPs by the trustee evidencing shared rights to receive rental payments the State may choose to appropriate.
The Interrogatories opinion does not indicate the presence of a trustee selling TRANs. Assuming, however, that such an intermediary would have been used to sell TRANs, act as a paying agent, and otherwise enforce the lease-purchase agreement, the absence of meaningful security in tangible property under TRANs distinguishes that situation significantly from the Department's COP transaction. The participants' legal rights and protections under the Department's COPs are substantially stronger than those of the TRANs investors. In my view, the legal realities of the transaction as a whole are different.
In addition, the Interrogatories Court approved the Dougherty
transaction for TABOR purposes with full knowledge that it involved the issuance of COPs. 979 P.2d at 557. The Dougherty
opinion specifically referred to the issuance of COPs in two places. 890 P.2d at 202, 208. Therefore, the mere issuance of COPs in connection with the Department's lease-purchase agreement does not decide the TABOR question under the Interrogatories analysis.
In my view, the fact that COPs are negotiable instruments and securities does not alone dictate the need for a TABOR vote in this case.
b. Receiving Property, not Money. In the Interrogatories case, the Supreme Court construed the economic reality of the transaction as the State itself directly borrowing money to finance its road building program. According to the Supreme Court, the State was involved in "receiving money in the form of a loan from investors." Interrogatories, 979 P.2d at 557.
The Department's proposed transaction is significantly different. The State will not receive money. The Department will only receive tangible property to use, the vehicles in the program.
c. Security Interest. The participants own the COP proceeds until they are used to acquire the vehicles, including any balance of project funds not used for that purpose. The Department will lease motor vehicles, not own them. The private lessor owns the vehicles, and the trustee will hold a lien on the title owned by the private lessor. These circumstances are consistent with the transaction in Dougherty acknowledged by the Supreme Court as proper without an advance vote.
In Interrogatories, the Supreme Court was concerned about a State pledge of its credit to borrow money through the issuance of notes. The Court was concerned because there was no lien on any asset acquired with the money raised by the notes. The absence of meaningful security for the lender in a commercially reasonable setting left the Court with the unshakable impression that the State's credit was the real security.[4]
The Interrogatories Court thought this situation so risky to a reasonably prudent investor that the State would inevitably be required to use credit enhancement mechanisms, such as letters of credit or bond insurance, simply to induce investment in the TRANs. This in turn demonstrated to the Court that the real thing of value in the deal was the State's credit. The Court concluded the State would be legally obligated to pay in the future, which created a multiple fiscal year financial obligation of TABOR significance.
The TRANs situation is materially different from the security interest in motor vehicles present in the Department's program. Meaningful, commercially reasonable security is available in the Department's program: the leased cars. The market for the State's used cars should be at least as good as the market for used road graders in Dougherty.
Therefore, the Supreme Court's reference in Interrogatories to a continuing security interest from year-to-year is not a fatal flaw for the Department. Here, the trustee's ability to enforce the lien in the fiscal year following non-appropriation or non-renewal is merely a commercially reasonable remedy and does not create a multiple fiscal year financial obligation. Legally, the remedy (repossession) and the action that gave rise to it (non-renewal) occur in the same fiscal year. It is precisely the presence of a surviving right to enforce a meaningful security interest in tangible private property that makes the transaction commercially viable without primary dependence upon a pledge of the State's credit or some other multiple fiscal year financial obligation directly against the State.
d. Credit Enhancement Mechanisms. The Department's proposed vehicle lease transaction involves the acquisition of bond insurance, a credit enhancement mechanism. Acquiring bond insurance is a cost of the Department's transaction and not a pledge of the State's credit. In the event the bond is called, the insurer pays the obligation and is subrogated to the rights of the insured (the trustee on behalf of the participants). The insurer obtains no additional rights against the State; foreclosure on the vehicles owned by the lessor remains the remedy.[5]
In the Department's proposed program, bond insurance is not required to make the deal work. The transaction stands on its own merit, based on its meaningful security in tangible property and other factors. Moreover, bond insurance pays for itself by raising the credit worthiness of the transaction from AA to AAA, which reduces the amount of the Department's lease payments. This reduction in the interest rate more than offsets the bond premium without altering the limited remedies against the State.
e. Duration. The TRANs legislation authorized the Department of Transportation to issue notes of any duration, as determined to be appropriate by the Executive Director of that department.Interrogatories, 979 P.2d at 564 (proposed § 43-4-704(4)(a)). The Court found the duration of the notes was likely at least 15 years, well beyond the guarantee of federal funds through the year 2003. Interrogatories, 979 P.2d at 558. The Court did not specifically cite the absence of a fixed duration as a fatal flaw in the case of TRANs, but it was troubled by the prospect of note obligations up to 15 years. Id.
The Department's repayment in its proposed motor vehicle lease-purchase agreement will be of finite duration. Unlike the TRANs situation, the Department's repayment term will be consistent with the length of the expected revenue stream that supports the obligation.
f. Sources of Lease Payments. While the Supreme Court was troubled in Interrogatories by a State obligation heavily dependent upon uncertain federal funding, the revenue stream for repayment of the Department's vehicle acquisition program is substantially under the State's control. The risk of non-payment of rent for lack of revenue is virtually non-existent.
g. Relative Dollar Amount of the Transaction. The Supreme Court inInterrogatories was concerned about the sheer magnitude of the dollars involved. The Court noted that the one billion-dollar issuance of notes by the State was nearly twice the entire annual budget of the Colorado Department of Transportation for construction, maintenance and operations in the fiscal year ending June 30, 1999. The State had little flexibility to cover such a huge borrowing in the event of lost federal funding.
In the Department's program, by contrast, the size of the transaction is much less significant to the State. The amount in issue is approximately $50 million — in comparison to the Department's current annual operating budget of approximately $149 million. Ch. 363, sec. 2, 2001 Colo. Sess. Laws 1949, 2149. Moreover, the cost of vehicle lease-purchase payments is spread among 19 departments paying user fees to the Department, and those vehicle payments are only a small fraction of each individual agency's total annual operating budget.
h. Private Lessor. In the TRANs situation, the State would own both the proceeds of issuance and the roads built with the money. The State would grant a security interest in some portion of this large pot of money it controlled.
Conversely, in the Department's proposed vehicle lease-purchase a private lessor will own tangible property leased to the State. The lessor will assign its interests to a commercial bank or other financial institution as trustee. Thus, the private lessor will grant the private trustee bank a security interest in private property. This situation is much like the circumstance of the road grader transaction approved in Dougherty without a vote of the People.
i. Cost of an Election. TABOR does not require absurd results, such as requiring voter approval for every government lease-purchase agreement. Interrogatories, 979 P.2d at 557. TABOR is construed in accordance with basic statutory construction principles in Colorado, which contain a presumption in favor of a sensible result. Bickel v. City of Boulder, 885 P.2d 215, 228, n. 10 (Colo. 1994). See also § 2-4-201(1)(c), C.R.S. (2001).
For a transaction as small as the Department's vehicle purchase program, an election would be economically wasteful.[6] The relative size and commercially reasonable business nature of the transaction implies that it is not one to be put to a vote. Requiring commercially reasonable transactions be submitted for advance voter approval under TABOR "could cripple the everyday workings of government." Interrogatories, 979 P.2d at 557.
j. Conclusion. Based upon this review of the factors considered in the Interrogatories case, I conclude that the Department's vehicle acquisition program does not require a vote of the People under TABOR.
D. STATUTORY AUTHORITY FOR LEASE PURCHASES
The proposed transaction raises two additional questions under statutes governing the use of COPs in connection with lease-purchase transactions. The first is whether the Department must use the Master Leasing Act to accomplish its objectives. The second is whether those agencies covered by § 24-82-801, C.R.S. (2001), must specifically request permission to use COPs as part of their budget documents submitted to the General Assembly.
I conclude that the Master Leasing Act is not the exclusive vehicle for the proposed transaction. I further conclude that the Department must inform the legislature of its intention to use COPs in connection with a lease-purchase appropriation request.
1. Master Leasing Act.
In 1987, the General Assembly enacted the Master Leasing Act, §§24-82-701 to 24-82-709 (the "Act" or "Part 7"). The Act is the first State statutory scheme recognizing and authorizing the use of COPs by state agencies in connection with lease-purchase agreements. See § 24-82-703, C.R.S. (2001).
By its terms the Master Leasing is not exclusive. Section24-82-708(2), C.R.S. (2001), states:
24-82-708. Fiscal rules inapplicable — independent powers.
 (2) The powers conferred by this part 7 are in addition to any other law, and the limitations imposed by any other law do not affect the powers conferred by this part 7 and do not apply to the financing and refinancing contemplated by this part 7.
The purpose of the Master Leasing Act is to provide the executive branch with a discretionary vehicle to consolidate lease purchase agreements statewide, in order to utilize economies of scale in the issuance of COPs.[7]
The term "master leasing program" is defined in the statutes to mean "the refinancing, revising, replacement, or consolidation of any existing or additional lease-purchase agreement or agreements." Section 24-82-701(4), C.R.S. (2001). The definition of "additional lease-purchase agreement" is limited to those instances where the Department is acting pursuant to Part 7, and does not encompass every lease-purchase transaction the State might undertake. Section 24-82-701(1), C.R.S. (2001), states as follows:
 "Additional lease-purchase agreement" means any transaction entered into on or after July 1, 1987, in which the state, acting by and through the department of personnel as provided by this part 7, is the lessee of real or personal property which shall be used by the state and in which the state has an option to purchase such real or personal property.
(Emphasis added.) Similarly, the Colorado Capital Finance Corporation created pursuant to § 24-82-703, C.R.S. (2001), must be the lessor under any "additional lease-purchase agreement" only when the State is acting "pursuant to this part 7."
I conclude, therefore, that Part 7 applies only when the Department elects to invoke it.
2. Other Lease Purchase Statutes.
The Department is expressly authorized to enter into lease-purchase agreements for the acquisition of motor vehicles independent of the Master Leasing Act. Section 24-30-1117, C.R.S. (2001) says the Department can "purchase, lease and otherwise acquire" vehicles. Section 24-82-801(2), C.R.S. (2001), enacted after the Master Leasing Act in 1990, generally limits the use of lease-purchase agreements over $50,000 unless the General Assembly specifically authorizes the transaction by separate bill or line item appropriation. The current Long Bill authorizes lease-purchases of motor vehicles by the Department. Ch. 363, sec. 2, 2001 Colo. Sess. Laws 1949, 2143.
Lease-purchase agreements involving the issuance of COPs are permitted under § 24-82-801(2) if the following condition is satisfied:
 A court of competent jurisdiction renders a final decision as to the constitutionality of the issuance of certificates of participation or other instruments evidencing the commitment of a district to make payments in subsequent fiscal years of moneys due under an installment purchase agreement for the purchase of real or personal property which requires payments during more than one fiscal year, or any agreement for the lease or rental of real or personal property which requires payments during more than one fiscal year and under which such district is entitled to receive title to the property at the end of the term for nominal or no additional consideration.
I conclude that the Interrogatories and Dougherty decisions satisfy this statutory condition.[8]
3. Lease Purchase Appropriations
The final legal question is whether the Department's budget request for lease-purchase appropriations under § 24-82-801, C.R.S. (2001) must include a specific request to use COPs. I answer this question in the affirmative. For those agencies covered by § 24-82-801, applicable statutes evidence a legislative intent to be informed as to the proposed use of COPs in connection with approving any legislation authorizing a lease-purchase appropriation for the acquisition of capital assets.[9]
Section 24-82-801(3) originally required a specific appropriation for lease-purchase agreements in excess of $50,000, and authorized the use of COPs. Ch. 194, 1990 Colo. Sess. Laws 1286. After TABOR passed in 1992, the General Assembly amended the statute to preclude the use of COPs unless a court of competent jurisdiction found them lawful without a vote. Ch. 328, sec. 4, 1993 Colo. Sess. Laws 2031, 2034. In the same bill, the General Assembly added subsection § 24-30-202(5.5) to the State Controller's statute.
As originally enacted, § 24-30-202(5.5) accomplished five things. First, as described above, it validated the non-appropriation doctrine under TABOR by declaring that multi-year contracts subject to annual appropriations did not require a vote under § 20(4)(b) of TABOR. Second, the original statute limited the use of COPs until a court ruled them constitutional without a TABOR vote. Third, the statute required the former Department of Administration (now the Department of Personnel) to report the occurrence of any such ruling to the executive committee of the legislative council, the joint budget committee and the capital development committee. Fourth, these legislative committees were required to make recommendations to the full General Assembly regarding any appropriation under 24-82-801 involving the use of COPs. Finally, the statute required the Department and the Colorado Commission on Higher Education to keep data on the financial benefits of using COPs.
After the Dougherty decision was reported to the General Assembly, § 24-30-202(5.5) was amended to eliminate the court approval precondition. Ch. 199, sec. 8, 1999 Colo. Sess. Laws 685, 688.[10]
However, the statute remains unchanged in plainly contemplating that the General Assembly would be informed of an agency's intent to use COPs in connection with a lease-purchase appropriation request under § 24-82-801. Although no statute expressly requires that budget submittals specifically request permission to use COPs, concluding otherwise would lead to results contrary to basic principles of statutory construction.
The last two sentences in § 24-30-202(5.5) would be rendered meaningless if permission to use COPs were not required. See §2-4-201(1)(b), C.R.S. (2001) (entire statute must be given effect). The reports of state agencies regarding the cost-benefit of COPs would never be utilized and three legislative committees would not be making any recommendations on the proposed uses of COPs because they would not know about them. See § 2-4-203(1)(e) (construction of ambiguous statute may include consideration of the consequences of a particular construction).
Since § 24-30-202(5.5) expressly cross-references § 24-82-801, the two must be read together. Construing these statutes together, I conclude that the General Assembly intended to be informed of the use of COPs in connection with a lease-purchase appropriation request under § 24-82-801. The plain intent was to draw the attention of the entire legislative body to the proposed use of COPs for any desired debate on the matter.
In the present circumstance, the current Long Bill contains a line item authorizing the expenditure of $17 million for lease-purchase of motor vehicles in FY 2001-02. "Efficiency Item #3" of the Department's budget request for FY 2000-01 expressly recommended the General Assembly authorize the use of COPs in connection with lease-purchases of motor vehicles. In response the General Assembly reduced the dollar amount of motor vehicle line for FY 2000-01 by the amount of the projected COP savings. Although COPs were not undertaken last fiscal year, for FY 2001-02 the General Assembly again reduced the Long Bill appropriation from previous levels by the amount of projected COP savings.
Section 24-30-202(5.5) contemplates notice and an opportunity for the General Assembly to debate the issue. This condition has been satisfied.
 III. CONCLUSION
I conclude that the Department's proposed lease-purchase transaction is lawful without advance voter approval under TABOR. The Department is not required to utilize the Master Leasing Act to carry out its program. Finally, the Department's budget request for lease-purchase appropriations must specifically request permission to use certificates of participation, and this condition has been satisfied.
Issued this 10th day of December, 2001.
KEN SALAZAR Attorney General
David Kaye First Assistant Attorney General
 FOOTNOTES
[1] As described in detail below, a principal rule is that Colorado's government cannot constitutionally promise payment of money unconditionally in future fiscal years. In a multi-year contract, the government must have the ability to withdraw from the arrangement if it chooses in the future not to pay.
[2] Colorado's annual general appropriations act (the "Long Bill") contains the Department's spending authority to acquire motor vehicles under the heading "Fleet Management Program and Motor Pool Services." Ch. 363, sec. 2, 2001 Colo. Sess. Laws 1949, 2143. The specific line item is entitled "Vehicle Replacement Lease, Purchase or Lease/Purchase," and for FY 2001-2002 appropriates $17,281,921 for vehicle payments. This line item was adopted based upon the Department's FY 2000-01 budget request, which expressly recommended the use of COPs for the proposed lease-purchase. The Department advises me that the General Assembly permanently reduced the program's line item appropriation for FY 2000-01 and subsequent years based upon the amount of projected savings from the use of COPs.
[3] The Colorado Capital Finance Corporation, created by the General Assembly pursuant to § 24-82-703, C.R.S. (2001), will not be the lessor in the Department's proposed transaction.
[4] Under the TRANs legislation, the investors were secured by a lien on the unspent note proceeds held by the State. This security diminished to nothing as money was spent building roads. In fact, the key risk to the investors was the possibility that federal funds for highways might not be available in the future. The State would likely have committed to expend most of the one billion-dollars in note proceeds on highway projects by the year 2003, beyond which continued federal funding was uncertain. The Court was impressed that if federal funds were lost after the proceeds were spent, the State could not satisfy the remaining obligation by surrendering ownership or possession of highways.
[5] The Supreme Court's concerns about credit enhancement mechanisms are distinguished from the Department's proposal to use bond insurance on additional grounds. First, the TRANs legislation authorized letters of credit, which, in some cases may involve greater obligations by the lessee than merely purchasing a bond insurance policy. Second, the Supreme Court believed that no market existed for TRANs without credit enhancers, due to the substantial risk involved in having a $1 billion obligation so dependent upon uncertain federal funding with no tangible property as security.
[6] Prior to conducting a TABOR election a district must publish a notice meeting certain requirements. Colo. Const., art X, §20(3)(b). According to unofficial records of the Colorado Secretary of State, such notice costs about $863,000 per election. The Department's proposal to acquire vehicles as examined in is opinion is to save the taxpayers $1.7 million dollars. Incurring nearly $1 million to seek voter approval to save $1.7 million would consume half of the potential savings.
[7] Section 24-82-702(1), C.R.S. (2001), provides in part:
 If the director determines that the state will realize economic or other benefits by revising or replacing existing lease-purchase agreements, or by entering into additional lease-purchase agreements, or by combining all or any portion of existing or additional lease-purchase agreements authorized by appropriations made by the general assembly, the director may develop a master lease program and execute such agreements.
[8] The court approval requirement was added to both the Master Leasing Act and § 24-82-801(2) in the same bill. This also indicates that the General Assembly viewed these statutory schemes as independent sources of authority for lease-purchase agreements involving COPs. See Ch. 328, 1993 Colo. Sess. Laws 2031-34 (Senate Bill 93-245).
[9] The Department of Transportation and institutions of higher education are exempt from this limitation if they have other legal authority to enter into lease-purchase agreements. Section 24-82-803(4), C.R.S. (2001).
[10] In its entirety § 24-30-202(5.5) now declares:
 Any commitment voucher that provides that the financial obligations of the state in subsequent fiscal years are contingent upon funds for that purpose being appropriated, budgeted, and otherwise made available shall not be deemed to create any state multiple-fiscal year direct or indirect debt or other financial obligation whatsoever for purposes of section 20(4)(b) of article X of the state constitution. If a lease-purchase agreement is subject to the requirement of specific authorization by the general assembly under part 8 of article 82 of this title, such committees shall make a recommendation to the general assembly concerning whether to authorize the lease-purchase agreement involving the issuance of certificates of participation or other instruments. The department of personnel and the Colorado commission on higher education shall maintain comparative data which will assist in determining the relative costs to the state, over the entire term of the arrangement, of financing the purchase or lease of property through pay-as-you-go methods, certificates of participation